[Civ. No. 60964. Second Dist., Div. One. June 29, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
LOS ANGELES PALM, INC., Defendant and Appellant.

COUNSEL

Bushkin, Kopelson, Gaims, Gaines & Wolf, John Gaims and Rauer L. Meyer for Defendant and Appellant.

Lukens, St. Peter & Cooper, M. Armon Cooper and Joan G. Cullin as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, District Attorney, Harry B. Sondheim and Roderick W. Leonard, Deputy District Attorneys, for Plaintiff and Respondent.

OPINION

**WADDINGTON, J.\***—The district attorney filed a complaint against defendant seeking an injunction, restitution and civil penalties for acts of unfair competition. The bulk of the complaint alleged charges of inadequate record keeping and improper wage payments to employees. Most importantly, on this appeal, the complaint alleged defendant had credited or deducted tips of their employees from their minimum wage, thereby engaging in an act of unfair competition. Plaintiff and defendant filed declarations in the trial court. After a hearing, the court enjoined defendant from crediting tips against wages owed. From that order, defendant filed this appeal.[1]

Appellant contends: (1) respondent seized evidence without a warrant in violation of the Fourth Amendment to the United States Constitution and article I, section 13, of the California Constitution; (2) the Labor Code precludes filing a complaint alleging unfair competition; (3) the Labor Code authorizes an employer to deduct tips against the minimum wage.

FACTS

On August 7, 1978, Investigator Galindo from the State Department of Industrial Relations, Division of Labor Standards Enforcement (hereafter Division), entered the restaurant premises owned by respondent to determine compliance with Labor Code laws and to inspect

---

*Assigned by the Chairperson of the Judicial Council.
[1]Although the court issued other orders, none is relevant here.

business records.[2] Galindo encountered the manager, one Neal Meyers.[3] After Galindo identified himself, a colloquy ensued between them regarding the purpose of the visit. The parties dispute the legal effect of the conversation, to be discussed *infra*, but in any event the manager directed Galindo to contact the bookkeeper for further information in the records. The bookkeeper cooperated with Galindo and furnished him evidence of employee records. Thereafter, Galindo made a second and third trip to the restaurant and obtained additional evidence without objection. From these records information was used in support of the complaint and offered in evidence at the hearing. At no time did Galindo act pursuant to a search warrant, an inspection warrant nor judicial order.

I

Appellant contends the search of the records conducted without prior judicial authority violates the Fourth Amendment of the United States Constitution and its state counterpart, article I, section 13, of the California Constitution. Because the search is essentially administrative in nature, a warrant is arguably required under the doctrines announced by the United States Supreme Court in *Camara* v. *Municipal Court*

---

[2] Pursuant to the authority of Labor Code sections 1174 and 1175: "Every person employing labor in this state shall: [¶] (a) Furnish to the commission, at its request, reports or information which the commission requires to carry out this chapter. Such reports and information shall be verified if required by the commission or any member thereof. [¶] (b) Allow any member of the commission or the employees of the Division of Industrial Welfare free access to the place of business or employment of such person to secure any information or make any investigation which they are authorized by this chapter to ascertain or make. The commission may inspect or make excerpts, relating to the employment of employees, from the books, reports, contracts, payrolls, documents, or papers of such person. [¶] (c) Keep a record showing the names and addresses of all employees and the ages of all minors. [¶] (d) Keep at the plants or establishments at which employees are employed, payroll records showing the hours worked daily by, and the wages paid, to employees employed at the respective plants or establishments, and which shall be kept in accordance with rules established for this purpose by the commission. All such records shall be kept on file for at least one year.

"Any person, or officer or agent thereof, is guilty of a misdemeanor who: [¶] (a) Neglects or refuses to furnish the information requested under the provisions of Section 1174. [¶] (b) Refuses access to his place of business or employment to any member of the commission or employee of the Division of Industrial Welfare when administering or enforcing this chapter. [¶] (c) Hinders such member, or employee in securing information authorized by Section 1174. [¶] (d) Fails to keep any of the records required by Section 1174."

[3] Galindo incorrectly but honestly believed he met with a different manager, one Louis Del Maestro. Subsequently he determined the correct name of the manager was Meyers.

(1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727], and *See* v. *Seattle* (1967) 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737, 1741]. In each of these cases, the Supreme Court held that governmental agencies must obtain a warrant to search private residences for building code violations or private portions of premises not open to the public to determine fire code violations unless such business is closely regulated. (*Marshall* v. *Barlow's, Inc.* (1978) 436 U.S. 307 [56 L.Ed.2d 305, 98 S.Ct. 1816].) While a sanitation or health inspection of a restaurant facility might dispose of the need for a warrant on an emergency theory,[4] entry and search for business records would ordinarily not invoke the emergency exception. Under normal circumstances, therefore, the office of a restaurant does not differ significantly from any other privately owned business open to the public.[5]

■ An exception to the warrant requirement exists if an authorized party voluntarily consents to a search without a warrant. (*People* v. *James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135].) Under settled constitutional principles, a party may waive the warrant requirement and consent to a search if the waiver is voluntary, authorized properly and solicited without threat, coercion or fraud. (*Bumper* v. *North Carolina* (1968) 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788].) No question exists that the manager of the respondent lacked authority to consent. The central issues are: voluntariness of the consent and absence of threats. The burden is on the prosecution to establish each of these prerequisites. (*People* v. *James, supra,* 19 Cal.3d 99.)

Galindo testified he arrived at the location and identified himself. What occurred thereafter is set forth in the margin.[6]

---

[4]"Although *Camara* required a warrant in the context of its particular holding, the court emphasized that its decision was not 'intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations.'" (*People* v. *Hyde* (1974) 12 Cal.3d 158, 168 [115 Cal.Rptr. 358, 524 P.2d 830].)

[5]In *People* v. *Firstenberg* (1979) 92 Cal.App.3d 570 [115 Cal.Rptr. 80], the court approved warrantless searches of nursing homes. The court emphasized that the nature of the facility and its occupants dictated the need for intensive public inspection to avoid overreaching or mistreatment of patients unable to care for themselves.

[6]Clerk's transcript:
"Q How did you come to speak with [the bookkeeper] when you went there that day?
"A I was told by a person that I thought was Louie Delmaestro—and it wasn't him, but he was the man that said he was the manager. And he could not answer any questions. He said he was very busy and that he would let me talk to the bookkeeper and she would answer any questions I had.
"Q What questions did you ask of him?

■ While the record is not altogether clear, the tenor of the testimony supports the voluntariness of the consent. Apparently the manager

"A I asked them if they had an IWC order posted, if they had a work schedule posted, if they had a pay day notice posted, if they had a workmen's compensation certificate posted naming the company and the policy number. And I think that was all.

"Q When you went to the Palm that day, did you take any subpoenas with you?

"A No.

"Q Did you serve any subpoenas upon the Palm that day?

"A No, I did not.

"Q Did you ask Mr. Delmaestro or any other person in management to see any documents at the Palm that day?

"A Yes.

"Q Who did you ask?

"A The person that I met there that was said was the manager, the person that was in charge at the time.

"Q What documents did you ask to see?

"A I just mentioned them to you. I wanted to see if he had an IWC order posted, if he had workmen's compensation and pay day notice, payroll records.

"Q What was his response when you asked him for these documents?

"A He said he was too busy and he couldn't talk to me, that he would let me talk to the bookkeeper, or something to that effect.

"Q But he told you that the bookkeeper would help you?

"A Yes, that she would answer my questions, yes.

"Q And thereupon did you meet with [the bookkeeper]?

"A Yes.

"Q Do you recall where in the restaurant you met with her?

"A In her office—or, in the little office. I don't know if it was hers.

"Q But that was an office in the back of the restaurant?

"A Yes.

"     .     .     .     .     .     .     .     .     .     .     .

"Q What questions did you ask of the bookkeeper, Miss Gregory?

"A I—as I recall, I asked to see payroll records, evidence of workmen's compensation insurance coverage, pay day notice, IWC order. And that's all I can remember at this time.

"Q Did you explain to her or to anybody in management any right you had to see those documents at the time of your visit?

"A Any right I had to see them?

"Q Yes.

"A No, I don't recall.

"Q Did you explain or describe how you felt you were entitled to see those documents at the time of that visit?

"A I think—I'm not positive, but it seems like I—I remember this man that was the manager there didn't want to even talk to me and he said that he didn't have time and—I—I just don't recall, really. I don't know.

"Q But what you are saying, you don't have any specific recollection of explaining or identifying how you felt you were entitled to see any documents at the time of that visit, do you?

"A No specific recollection, no.

"Q To your knowledge did anyone else in the Division other than you give any advance warning to the Palm Restaurant that you would be making that investigation and that visit?

"A No.

"Q What documents did you see that day at the Palm?

was extremely busy with restaurant affairs and disinclined to discuss mundane record keeping matters. This interpretation is corroborated by his direction to Galindo to contact the most obvious person to answer his questions—the bookkeeper. After this directive, Galindo obtained

"A I remember seeing some payroll records. And I think that's the only ones I saw.

"Q Did you ask [the bookkeeper] any questions?

"A Yes.

"Q Do you recall what you asked her?

"A No, not specifically.

"Q In general.

"A I asked about the payroll records; how—how they were figured out, what hours were being paid to certain individuals for the amount of money being shown, what company they had coverage with on workmen's compensation. Questions like that in general.

"Q When you first met [the manager] there he was perfectly cooperative with you, wasn't he?

"A Well, if we are talking about the first individual that I saw—

"Q Yes—

"A —that was the manager—

"Q The one you identified as being an Italian?

"A Well, I said I believed that this person was [the manager] but apparently he isn't. Now, you know, I know that he wasn't.

"Q Well, whoever you met that day, you understood him to be part of management?

"A Yes.

"Q He was perfectly cooperative with you, wasn't he?

"A No.

"Q In what ways wasn't he?

"A Well, he didn't want to talk to me. He said that he didn't have the time, that we are—had no business being there or something to that effect, and that he would let me speak with the bookkeeper and she would answer whatever questions I had, or something to that effect.

"Q Did he want to know who you represented?

"A Yes.

"Q Did he want to know why you were there?

"A I don't recall that he asked.

"Q Did he want to know if anything was wrong?

"A No, he didn't ask me if anything was wrong, as I remember, no.

"Q Did he ask if there was some investigation going on?

"A I don't recall.

"Q What you recall is that he was generally objecting to your being there and asking to see documents and so forth?

"A Yes.

"Q Do you recall what [the bookkeeper] told you in substance? As best you recall.

"A As best I recall, she just basically answered the questions that I had, gave the information that I requested. But I don't recall anything specific, no.

"Q When this management person you were speaking to objected to your being there and looking at the documents, did you tell him that you felt that you were entitled to get the information that you were looking for?

"A Yes.

"Q Did you give any reason for your opinion that you were entitled?

"A Well, I don't remember any reason in particular, but I must have, because normally that would have been the procedure. If they would have asked me why, I would

the necessary information without any objection. Witnesses for appellant testified, denying they consented to the search. Moreover, testimony was offered that Galindo threatened them with criminal penalties if they refused. Galindo denied any threats in a counterdeclaration. The trial court concluded that "in the matter of the search, there is, I believe, credible evidence which persuades me, at least for the purposes of this hearing, that it was a legal search." While this conclusion is not specifically a finding of fact, the court obviously elected to accept the testimony of Galindo.

This court is bound by the implied factual finding of consent and the evidence supports that conclusion. Although the trial court did not actually observe the witnesses in court because all testimony was offered by deposition and declaration, the factual dispute demanded resolution of the conflict. "'On appeal, all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.'" (*People* v. *Rios* (1976) 16 Cal.3d 351, 357 [128 Cal.Rptr. 5, 546 P.2d 293].)

## II

■ Appellant contends that Business and Professions Code section 17200[7] cannot support the alleged unfair business practices recited in the complaint and that Labor Code sections 1171 through 1179[8] provide the exclusive remedy to recover unpaid minimum wages. In *People* v. *McKale* (1979) 25 Cal.3d 626 [159 Cal.Rptr. 811, 602 P.2d 731], the district attorney filed complaints alleging unlawful competition against the defendant for claimed violations of the Mobile Home Parks

---

have told them.

"Q What was your normal procedure? What would you have told them?

"A Well, that I was from the Department of Labor Standards Enforcement, I was there to conduct a routine investigation and—I don't remember exactly how the whole thing went, but something to that effect.

"Q That is what you recall in general?

"A Yes."

Later on he testified: "Again, if that conversation—I remember that conversation, but I don't know if it was the second time or the first time. But it was one of those times that the conversation took place. But he did not want to give me anything, he was busy, he didn't want me around, he wanted me to get the hell out."

[7]Business and Professions Code section 17200 provides: "[U]nfair competition shall mean and include unlawful, unfair or fraudulent business practice . . . ."

[8]Pertaining to wages, hours and working conditions.

Act.[9] In reversing a judgment entered upon a demurrer sustained against the People, the court held: "Unfair competition is defined to include 'unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising.' (Bus. & Prof. Code, § 17200.) California courts have consistently interpreted such language broadly. An 'unlawful business activity' includes '"anything that can properly be called a business practice and that at the same time is forbidden by law."' (*Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817].) The Legislature 'intended ... to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur.' (*Id.* at p. 111.)" (*People* v. *McKale, supra*, 25 Cal.3d 626, 631-632.)

In responding to a similar contention asserted by appellant here, the court said: "The district attorney is expressly authorized to maintain a civil action for either injunctive relief or civil penalties for acts of unfair competition (Bus. & Prof. Code, §§ 17204, 17206). Business and Professions Code section 17205 also provides that remedies and penalties available in an unfair competition action are cumulative to remedies and penalties available under other state laws, unless otherwise expressly provided." (*Id.* at p. 633.)

The clear language of the Business and Professions Code prohibiting unfair competition authorizes filing of a complaint for unfair competition supplementary to any other provision of the law. That the Labor Code provides similar relief against unlawful labor practices cannot foreclose cumulative remedies under the Business and Professions Code if the alleged misconduct does indeed constitute an unfair business practice. (See III.)

## III

Appellant contends that crediting tips against minimum wages does not violate the provision of Labor Code section 351: "No employer or agent shall [1] collect, take, or receive any gratuity or a part thereof, paid, given to or left for an employee by a patron, or [2] deduct any amount from wages due an employee on account of such gratuity, or [3] require an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from

---

[9]Under Code of Civil Procedure section 3369, now Business and Professions Code section 17200.

the employer. Every such gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for...."

The identical argument was rejected by the California Supreme Court in *Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 729-730 [166 Cal.Rptr. 331, 613 P.2d 579]: "The employers contend that the IWC has misinterpreted the effect of the 1975 amendment to section 351, asserting that while the Legislature intended by such amendment to prohibit the IWC from allowing employers directly to deduct from an employee's wages tips that an employee actually receives, the Legislature did not intend to prohibit the commission itself from indirectly achieving a somewhat comparable result by establishing a lower minimum wage for tipped employees. Although the tip credit practice sanctioned by the IWC in the past may have engendered particular abuse because individual employers exacted credit from their employees on an individual basis, we think that the legislative history of the 1975 bill supports the IWC's conclusion that the Legislature contemplated that the enactment would insure that tips received by an employee would not reduce an employer's minimum wage obligation, either directly or indirectly. [¶] For example, an analysis of the 1975 bill by the Senate Industrial Relations Committee specifically states: 'The effect of this bill would be to require employers to pay employees at least the minimum wage regardless of the amount of tips the employees receive.' Similarly, a memorandum on the legislation drafted by the Assembly Labor Relations Committee states in part: 'The basis for this legislation would appear to be that tips or gratuities are given for individual excellence of service above and beyond the basic duties of employment, and as such, the employer has no vested right to consider tips a part of wages.' In light of the legislative history, the IWC could reasonably interpret the amendment of section 351 as a legislative determination that all employees should be guaranteed a minimum wage that is not reduced by virtue of any tips an employee may possibly receive. As already noted, the commission's interpretation of the statutes which it administers is entitled to great weight, and, in our view, the employers have not demonstrated a sufficient basis for rejecting the commission's interpretation of this provision."

Appellant here has cited *Cal. Drive-In Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287 [140 P.2d 657, 147 A.L.R. 1028]. *McKale* not only cites the *California Drive-In* decision as supportive of its decision but adopts its rationale.

Improperly crediting tips against a minimum wage skews employee benefits such as vacation or sick time; inaccurately reflects income for federal and state income tax purposes; avoids payment of additional wages for overtime and split shifts. That the employees of appellant received better than average tips, according to appellant, which are partially reported, does not alter the above factors. Such a practice clearly violates California law and constitutes an unfair business practice within the meaning of the statute.

Order affirmed.

Lillie, Acting P. J., and Hanson (Thaxton), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 10, 1981.