[No. A061461. First Dist., Div. Two. May 8, 1995.]

KIRBY HUDGINS, Plaintiff and Appellant, v.
NEIMAN MARCUS GROUP, INC., Defendant and Respondent.

## COUNSEL

Bushnell, Caplan & Fielding, David H. Fielding and Charlotte Fishman for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, David A. Maddux, Susan Herbst Roos and Thomas A. Counts for Defendant and Respondent.

## OPINION

PHELAN, J.—Appellant Kirby Hudgins (hereafter appellant or Hudgins) seeks review of a judgment entered upon stipulated facts presented in connection with the parties' cross-motions for summary judgment. After a long and tortuous series of proceedings—involving first an order granting appellant's motion, then a mistaken issuance of an order granting the motion of respondent Neiman Marcus Group, Inc. (hereafter respondent or Neiman Marcus), a motion for clarification, a second order granting appellant's motion, a motion by respondent for reconsideration, belated intervention by the state Labor Commissioner in support of respondent's position, and, finally, an order granting respondent's motion—the San Francisco Superior Court concluded that a policy under which respondent deducts the amount of commissions previously paid for "unidentified returns" on a pro rata basis from the wages of their commissioned sales associates does not violate Labor Code sections 221 and 400 through 410,[1] or Business and Professions Code section 17200 et seq.

We agree with the trial court that this case presents a difficult question of wage and hour law. The California Division of Labor Standards Enforcement (DLSE) and its chief, the Labor Commissioner, have issued conflicting directives about questions raised by this appeal. However, the California courts have long held that, because of the special consideration accorded to wages, sections 221 and 400 through 410 prohibit deductions from wages for business losses unless the employer can establish that the loss was caused by a dishonest or willful act, or by the culpable negligence of the employee.

---

[1] All statutory references are to the Labor Code unless otherwise indicated.

The courts have also held that employers are not entitled to a setoff of debts owed by its employees against wages due those employees upon termination. After a careful review of the pertinent authorities, we conclude that the Neiman Marcus "unidentified returns" policy runs counter to this well-established line of authority and is, thus, unlawful. Accordingly, we will reverse the judgment of the trial court with directions to enter judgment in favor of appellant.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The material facts were stated by the parties in a joint stipulation of facts, substantially as follows:

### A. *The Parties to This Action.*

Neiman Marcus owns and operates five retail stores in California. Prior to August 26, 1987, Neiman Marcus was a division of Carter Hawley Hale. On August 26 1987, Neiman Marcus became a division of The Neiman Marcus Group, Inc., a defendant herein, which has assumed all liability of Carter Hawley Hale with respect to the subject matter of this lawsuit.

On June 16, 1986, Hudgins was employed as a sales associate at the Neiman Marcus store in San Francisco. Neiman Marcus sales associates are employees who work in the retail stores and sell merchandise to customers. All sales associates are paid on an earned commission basis and are entitled to a draw[2] against earned commissions to insure receipt of a minimum monthly income. Hudgins remained employed at the San Francisco Neiman Marcus store until June 16, 1988.

### B. *Neiman Marcus's Sales and Commissions Policies.*

When selling merchandise to customers, Neiman Marcus sales associates ring each sale on a POS terminal (a computerized cash register) and enter, among other numbers, their personal identification number (PIN). The information entered into the terminal is used to calculate the sales associate's gross sales for the pay period. The PIN is also printed on a multiple-page sales receipt, one page of which is given to the customer. An intact sales receipt clearly shows the PIN, thereby identifying the sales associate who sold the merchandise in the event of a return. Sales associates must also

---

[2]Each sales associate is assigned a dollar amount per hour that he or she receives for each hour worked without regard to sales. This "draw" is advanced against earned commissions to insure receipt of a minimum monthly income.

write their PIN on the price ticket, which is a tag or sticker attached to the merchandise. The PIN is placed on the price ticket so the original sales associate can be identified if the merchandise is returned without the sales receipt.

Until July 1986, commissions for Neiman Marcus's California sales associates were calculated each pay period by multiplying the sales associate's net sales by a predetermined commission percentage, which varied depending on the type of merchandise sold. Net sales equaled gross sales less returns, taxes, gift wrap and alterations. "Returns" consisted of all merchandise originally sold by the sales associate and returned during the pay period with adequate documentation to ascertain the identity of the original sales associate. Once the sales associate's net sales were multiplied by the predetermined percentage for the items sold, the total commission income was known. "Unidentified returns," those for which the original sales associate could not be determined, were not considered in the commission calculation.

Sometime in early 1986, Neiman Marcus estimated that unidentified returns had "grown over the years" to over $9 million in 1985 nationwide. Neiman Marcus believed the amount of unidentified returns was primarily the result of employee abuse, i.e., willful failure to follow the above described sales procedures, and that it could save approximately $650,000 per year on commissions which were overpaid on the returned merchandise.[3] Neiman Marcus decided it wanted to "prorate unidentified returns back to active salespeople." Neiman Marcus does not present any evidence to document the growth pattern for unidentified returns. Nor does it offer any data to substantiate its belief about the cause(s) of the unidentified returns losses.

Beginning in May 1986, Neiman Marcus set about to change its commissions policy at its retail stores nationwide. Under the new policy, which was instituted in California in July 1986, commission income is calculated each pay period by multiplying a sales associate's net sales by the same predetermined percentages, which vary depending on the type of merchandise sold. Net sales still equal gross sales less returns, taxes, gift wrap and alterations. "Returns" still consist of all merchandise originally sold by the sales associate and returned during the pay period. The key difference in the current commission calculation is that after the commission is calculated, Neiman Marcus deducts a prorated share of the commissions deemed to have been paid on unidentified returns received in the sales associate's home base during the pay period (the so-called "00777" deduction).

---

[3]This estimate of annual savings appears to be based on a calculation of the total amount of commissions paid on unidentified returns using a mean commission rate. Prior to 1986, this amount was not charged to the employees.

Unidentified returns include the following:

(1) Returns of merchandise for which the original sales associate cannot be identified because of insufficient documentation, such as (a) where the merchandise is returned without any price ticket or sales receipt;[4] (b) where it is returned without a sales receipt and with a price ticket that bears no PIN; or (c) where it is returned without a sales receipt but with a price ticket which bears an improper, incorrect or illegible PIN. Unidentified returns in all of these categories include returns for which the absence of a valid PIN may be attributed to the customer's negligence or misconduct, to Neiman Marcus's policies or failure to adequately train, supervise or discipline its sales associates, or to the employee's negligence or intentional abuse.

(2) Returns for which the original sales associate can be identified but has not been employed by Neiman Marcus for over six months.

(3) Returns of merchandise that was purchased at another Neiman Marcus store where the sales associate in that store cannot be identified.

(4) Returns based on defective merchandise, alteration, late delivery, goodwill and customer abuse. These items are also included in the calculation of identified returns.[5]

## C. Implementation Of The Unidentified Returns Policy.

Beginning in July 1986, all sales associates in California were given a copy of a document entitled "Commission Explanation" and asked to sign and acknowledge that they had read and received it. The parties dispute whether Hudgins was aware of the new unidentified returns policy when he was hired on June 16, 1986. However, there is no dispute that within a few days of being hired, and before he actually earned any commissions, Hudgins understood that his wages would be affected each month by application of the unidentified returns policy. Hudgins signed the "Commission Explanation" document on July 16, 1986.

Initially, the deduction for unidentified returns was computed as follows: (1) All employees were assigned to a "home base," which is defined as a group of selling departments organized on the basis of proximity to each other on the selling floor. (2) Neiman Marcus calculated the total amount of

---

[4] This category includes merchandise that was purchased from a store other than Neiman Marcus or, even, stolen merchandise.

[5] Returns of merchandise originally sold by management or by mail order—neither of which involves payment of a commission—are not treated as unidentified returns.

commissions paid on all unidentified returns received in the home base. (3) Neiman Marcus reduced that total by 10 percent to arrive at the amount to be prorated. (4) The final amount, if any, was then prorated among the employees who were currently assigned to that home base, based on the number of hours each employee was paid during that pay period.

During July through September 1986, Neiman Marcus reevaluated some aspects of the unidentified returns policy because of concerns raised by sales associates in its retail stores throughout the country. After a series of meetings with sales associates, Neiman Marcus made certain adjustments to the policy to address some of the sales associates' concerns. All sales associates were notified of the changes to the policy, which were effective September 16, 1986, but those who had signed the "Commission Explanation" in July and August were not asked to sign a new document. New sales associates were required to sign a revised "Commission Explanation."

Since the unidentified returns policy was revised in September 1986, unidentified returns have been calculated as follows: (1) All employees are assigned to a home base. (2) Neiman Marcus calculates the total amount of commission paid on all returns it considers to be unidentified returns within a home base. (3) Returns of merchandise sold by management, by employees who were terminated within the preceding six months, and by mail order are excluded from unidentified returns. (4) Neiman Marcus subtracts 5 percent from the total amount of commission paid on unidentified returns during most of the year, but subtracts a larger amount—15 percent—for the period December 20 through January 31 to determine the amount to be prorated to the sales associates.[6] (5) The final amount of commissions paid on unidentified returns, if any, is prorated among the employees assigned to the home base, based on the number of hours each employee is paid during that period.

### D. *The Proceedings Below.*

Hudgins filed his complaint in September 1987, alleging that Neiman Marcus unidentified returns policy violated section 221 and Business and Professions Code section 17200. The complaint sought restitution of sums unlawfully deducted from the earnings of respondents' commissioned sales associates in California by reason of the unidentified returns policy. The complaint further sought an injunction, appropriate orders directing respondent to pay civil penalties, and attorney fees. In February 1992, the parties

---

[6]These so-called "leeway factors" were intended to cover unidentified returns attributable to former employees whose employment had been terminated for more than six months, returns of merchandise purchased at other stores, customer abuse, theft, goodwill and defective merchandise. However, Neiman Marcus candidly admits it does not know what percentage of unidentified returns derives from each source.

filed stipulation and consent forms seeking an order of the superior court appointing the Honorable Thomas Kongsgaard, judge of the superior court, retired, as a temporary judge to hear and determine all issues in the case through final determination.

On or about June 2, 1992, the parties signed a joint stipulation of facts (JSF), containing 17 paragraphs of agreed-upon facts and 19 exhibits. That same day, the parties simultaneously submitted to Judge Kongsgaard their cross-motions for summary judgment. Briefing of the motions was completed by June 12, 1992. All of the motion papers and the JSF were filed on July 15, 1992. The parties also submitted to Judge Kongsgaard compendia of cases cited in support of their respective positions.

On June 16, 1992, a hearing was held before Judge Kongsgaard on the parties' cross-motions for summary judgment. By written order filed July 10, 1992, Judge Kongsgaard granted appellant's motion, and a further hearing was to be set to determine the amount of damages. However, sometime after July 10, the clerk of the San Francisco Superior Court advised Judge Kongsgaard that the order had been misplaced. Judge Kongsgaard instructed his secretary to send a duplicate to the court but, by error and inadvertence, the secretary sent in a draft of the order in which Judge Kongsgaard had ruled in *respondent's* favor. This second order was erroneously filed by the superior court on July 31, 1992.

On November 5, 1992, Judge Kongsgaard convened a hearing to explain to the parties what had occurred. Although the court clearly indicated that issuance of the second order was a mistake, respondent's counsel, Susan Roos (Roos), seized on the uncertainty of the moment to argue that the court should postpone final resolution of the situation until after the Labor Commissioner could issue an "administrative ruling" on the legality of an "unidentified returns" policy similar to that of Neiman Marcus. Roos told the court that, on June 22, 1992, shortly after the parties had submitted their cross-motions for summary judgment motion and shortly before the court had issued its first order granting summary judgment for appellant, the California Retailers Association (CRA) had requested a private opinion letter from the DLSE about the lawfulness of an unidentified returns policy similar to that of Neiman Marcus. However, no one informed the court that the CRA had written to the Labor Commissioner again on August 4, advising the Labor Commissioner of the court's July 10 order, and distinguishing the Neiman Marcus plan from the one on which the CRA had requested an opinion. Following the November 5 hearing, the court granted respondent's request for leave to file a motion for reconsideration of his previous order so long as she did so by November 23, 1992.

On or about November 24, Neiman Marcus filed its motion for reconsideration. As part of its moving papers, Neiman Marcus included a declaration of Ms. Roos attaching the private opinion letter the Labor Commissioner had issued to CRA a week earlier, on November 16. Appellant opposed the motion for reconsideration, in part by raising questions about the circumstances under which the Labor Commissioner's letter had issued, including a complaint that he had tried but was not allowed to have input into the Labor Commissioner's decisionmaking process on behalf of his employee clients.

On December 29, 1992, the trial court filed an order granting Neiman Marcus's motion for reconsideration and vacating its prior order of July 30. After hearings on January 8 and 13, 1993, the trial court reversed its prior order of summary judgment for appellant and entered a new order granting summary judgment to respondent. Judgment in favor of Neiman Marcus was entered on February 24, and a timely notice of appeal followed.

## II. Discussion

■ The central issue in this appeal is whether Neiman Marcus's policy of deducting a pro rata share of commissions previously paid for "unidentified returns" from the wages of all sales associates in the section of the store where the merchandise is returned violates sections 221 and 400-410.[7] As we have discussed, the trial court decided this issue on stipulated facts presented in the parties' cross-motions for summary judgment. " '[S]ince a summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, we independently review them on appeal . . . .' " (*Worthington* v. *Rusconi* (1994) 29 Cal.App.4th 1488, 1494 [35 Cal.Rptr.2d 169], quoting *AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].)

### A. *Neiman Marcus's Unidentified Returns Policy Violates The Labor Code.*

Appellant argues that this case is controlled by a 1962 Supreme Court decision, *Kerr's Catering Service* v. *Department of Industrial Relations* (1962) 57 Cal.2d 319 [19 Cal.Rptr. 492, 369 P.2d 20] (*Kerr's Catering*), and a 1979 court of appeal decision, *Quillian* v. *Lion Oil Company* (1979) 96 Cal.App.3d 156 [157 Cal.Rptr. 740] (*Quillian*), both of which deal with the rights of California employers to make deductions from employees' wages

---

[7]Appellant does not challenge the policy under which Neiman Marcus deducts amounts previously paid for "identified returns."

for cash and merchandise shortages. Respondent argues that the judgment below must be upheld in light of a private opinion letter issued by the California Labor Commissioner toward the end of the trial court proceedings in this case, and an opinion of an intermediate appellate court in Minnesota, *Oja* v. *Dayton Hudson Corp.* (Minn.App. 1990) 458 N.W.2d 169 (*Oja*), on which the Labor Commissioner relied. The opinions cited by Neiman Marcus deal with the rights of retail employers under, respectively, California and Minnesota state law, to deduct from their sales associate's commissions a pro rata share of previously paid commissions attributable to unidentified returns. For the reasons that follow, we conclude that appellant has the better of this argument.

Section 221 provides: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Commissions are wages within the meaning of section 221. (§ 200.) As interpreted by the Industrial Welfare Commission (IWC) and the California courts, section 221 has long been held to prohibit deductions from an employee's wages for cash shortages, breakage, loss of equipment, and other business losses that may result from the employee's simple negligence. (*Kerr's Catering, supra,* 57 Cal.2d at pp. 328-329; *Quillian, supra,* 96 Cal.App.3d at pp. 162-163; Cal. Code Regs., tit. 8, § 11070, ¶ 8 (Cal. Wage Order No. 7-80; cf. § 2865 [employee liable to employer for damage caused by "culpable" negligence]; and see generally, 4 Wilcox, Cal. Employment Law (1994 rev.) § 4.10 et seq. [Wage Deductions and Set-Offs].)[8]

Section 221 and related provisions in sections 222 through 223 were enacted in 1937 in response to secret deductions or "kickbacks" that made it appear as if an employer was paying wages in accordance with an applicable contract or statute, whereas, in fact, the employer was paying less. (*Kerr's Catering, supra,* 57 Cal.2d at pp. 328-329.) Those sections are, thus, declarative of a strong public policy against fraud and deceit in the employment

---

[8]In a ruling on a related subject, the Labor Commissioner has held that, although employers may deduct installment payments from an employee's paychecks for a debt owed to the employer with the employee's prior written consent, they are not entitled to a setoff for the balance of the indebtedness against the final paycheck of an employee who has terminated his or her employment. (DLSE Interpretive Bull. No. 85-3; and see § 201 ["wages earned and unpaid at the time of discharge are due and payable immediately"].) The Labor Commissioner reasoned that to allow such a deduction would "contravene[] the special considerations accorded to wages by the Legislature and the courts of California" (DLSE Interpretive Bull. No. 85-3 at p. 2, citing *Kerr's Catering, supra,* 57 Cal.2d 319), and would unjustifiably provide employers with self-help remedies that are not available to other creditors (DLSE Interpretive Bull. No. 85-3 at p. 3, citing *Barnhill* v. *Robert Saunders & Co.* (1981) 125 Cal.App.3d 1 [177 Cal.Rptr. 803]).

relationship. (*Ibid.*) Even where fraud is not involved, however, the Legislature has recognized the employee's dependence on wages for the necessities of life and has, consequently, disapproved of unanticipated or unpredictable deductions because they impose a special hardship on employees. (57 Cal.2d at pp. 326, 329; cf. § 224 [with prior written authorization from employee, employer may deduct insurance premiums, hospital or medical dues and other amounts it is required or empowered to withhold by state or federal law].)

In *Kerr's Catering, supra,* the employees were saleswomen who drove trucks that were sent out on regular routes to sell sandwiches, coffee and other food items, and who were compensated by a base salary plus a commission for items sold. At the start of the day, each saleswoman would take inventory of the items on her truck and receive a small amount of cash to make change. At the end of the day, she would again take inventory and count her cash. At the end of each month, the net amount of cash shortage was deducted from her commission. In no case did the deduction reduce the employee's compensation below the minimum wage. Our Supreme Court held that the IWC had the statutory authority to prohibit the deductions from commissions earned by the drivers of catering trucks for cash shortages that were " 'not caused by a dishonest or wilful act or by the culpable negligence of the employee,' " including losses beyond the employees' control and losses due to simple negligence. (57 Cal.2d at pp. 327-329.) In upholding the IWC's power to regulate, the court held that an employer could not make its employees insurers of its business losses. The court further noted that the deductions violated "the spirit, if not the letter, of the Employee's Bond Law [§§ 400-410]." (57 Cal.2d at pp. 327-328.) The court reasoned that the deductions were disapproved because of "the reliance of the employee on receiving his expected wage, whether it be computed upon the basis of a set minimum, a piece rate, or a commission." (*Id.* at p. 329.) Given the public policy considerations in favor of full payment of wages, and the legislative impetus for enactment of sections 221 through 223, and sections 400 through 410, the court upheld the rule prohibiting deductions of cash shortages from commissions. (*Kerr's Catering, supra,* 57 Cal.2d at p. 329.)

A similar practice was found to be unlawful in *Quillian, supra,* 96 Cal.App.3d 156. There, the manager of a combination gas station/market owned by Lion Oil Company was paid a salary in a fixed amount and a monthly "bonus incentive" that was calculated by applying a bonus schedule to the number of gallons of gasoline sold at the store that month, plus 1 percent of the volume of other sales for the month, with a deduction for any cash or merchandise shortages occurring in the period. On appeal, Lion Oil

argued that section 221 was inapplicable to its bonus plan because the cash and merchandise shortages were not deducted from the bonus, but were merely part of the calculation of the bonus. (96 Cal.App.3d at p. 160.) The Court of Appeal rejected this argument, saying, "Rather than call this incentive payment a commission and then deduct for shortages in contravention to *Kerr*, [Lion Oil] deducts shortages from the payment and calls the final result a bonus. [Lion Oil] then self-righteously proclaims that no deductions were made from the bonus. Unfortunately, the result is the same. The manager carries the burden of losses from the station." (*Quillian, supra,* at p. 163.) The court further held that the deductions contravened the public policy expressed in sections 400 through 410. (*Quillian, supra,* at p. 163.)

In her letter to the CRA, the Labor Commissioner opined that *Kerr's Catering* and *Quillian* are not determinative of, and are, in fact, irrelevant to the issue whether a deduction for unidentified returns is an illegal deduction from wages. As a general matter, the Labor Commissioner stated that a commission pay plan must conform to those "minimum labor standards" pertaining to payment of minimum wages, and to the time, place and manner of payment of wages. In addition, the plan must conform to the public policy expressed in sections 400 through 410, and in *Kerr's Catering*, and *Quillian, supra,* which—in the Labor Commissioner's view—only prohibit the deduction of cash and/or merchandise shortages from commission earnings that otherwise would be payable to employees. However, the Labor Commissioner distinguished the plan described in the CRA letters, saying that it "only takes account of identified and unidentified returns as factors in computing net sales; identified and unidentified returns are not cash and/or merchandise shortages, since by definition the merchandise has been returned by the customer to the employer and at the same time, an employee has been given credit for the sale even though the merchandise has been returned and the sale reversed."

After thus dispatching *Kerr's Catering* and *Quillian*, and proclaiming that there was otherwise a complete "absence of relevant California precedents on the subject of unidentified returns," the Labor Commissioner relied on a decision of the only court to have decided the precise issue presented in this case. (*Oja, supra,* 258 N.W.2d 169.) In that case, a 24-year employee of Dayton-Hudson department stores challenged her employer's newly adopted policy of deducting a proportionate share of commissions previously paid on unidentified returns. The employee claimed the unidentified returns policy violated a Minnesota statute that prohibits deductions ". . . from the wages due or earned by any employee . . . for lost or stolen property, damage to property, or to recover any other claimed indebtedness running from employee to employer . . . ." (*Oja, supra,* 458 N.W.2d at p. 171, quoting

Minn. Stat. § 181.79, subd. 1 (1988).) The court held that the employee's wages were not "due or earned" until returns—whether identified or unidentified—were subtracted from her gross sales. (*Oja, supra,* 458 N.W.2d at p. 171.) In essence, the court reasoned that Dayton-Hudson's deductions of unidentified returns were merely part of its calculation of net sales: "Returns do not result in repayment of past commissions, but merely reduce net sales for the period in which they occur." (*Ibid.*)

For several reasons, we respectfully disagree with *Oja* and reject the Labor Commissioner's opinion, which relies exclusively on that case for authority. First, the language of section 221 is significantly different than that of the Minnesota statute at issue in *Oja.* By enacting section 221, and retaining it as interpreted by the courts and the IWC, the Legislature has prohibited employers from using self-help to take back any part of "wages theretofore paid" to the employee, except in very narrowly defined circumstances provided by statute. (§ 221; see also §§ 222-224.) Furthermore, the Labor Commissioner's reading of existing California case law notwithstanding, the rationale employed by the Minnesota Court of Appeals to determine when and how a commission has been "earned" has been expressly rejected in California. (*Quillian, supra,* 96 Cal.App.3d at pp. 160-163.)[9]

---

[9]Respondent cites three cases for the proposition that *Oja* is consistent with California law: *Commeford* v. *Baker* (1954) 127 Cal.App.2d 111, 118 [273 P.2d 321]; *Division of Labor Standards Enforcement* v. *Dick Bullis, Inc.* (1977) 72 Cal.App.3d Supp. 52 [140 Cal.Rptr. 267]; and *Prudential Ins. Co.* v. *Fromberg* (1966) 240 Cal.App.2d 185 [49 Cal.Rptr. 475].) These cases all deal with the issue of when a commission has been earned by a terminated employee on a "sale" transaction that is not an instantaneous event (as in the context of retail sales) but, rather, is "completed" over a relatively long period of time during which the sales agent may be required to perform additional services for the customer. They also antedate Code of Civil Procedure section 487.020, subdivision (c), which strictly limits the attachment of wages. (See *Barnhill* v. *Robert Saunders & Co., supra,* 125 Cal.App.3d at pp. 5-6.) Thus, to the extent they remain viable as the law of California, they are inapposite to the issue presented in this appeal.

*Commeford, supra,* involved claims by four employees who, pursuant to a written agreement, were to receive a commission of 6 percent on "gross sales," less specific sales amounting to $50,000 to one customer, less the employees' expenses. The employees were all terminated on August 31, 1951, and alleged two causes of action to recover commissions they claimed were due: (1) under the contract for sales of products that were delivered by August 31; and (2) on a theory of quantum merit for products that had been ordered, but not delivered, by August 31. At trial, the employees recovered the full amount of commissions due on the first cause of action, but the trial court granted a nonsuit as to the second cause of action only as to the sales that were in the process of execution. The Court of Appeal reversed the judgment of nonsuit, holding that the plaintiffs had presented sufficient evidence to support a claim under the contract and that the trial court had abused its discretion in not allowing the plaintiffs to amend their complaint to plead a contract theory of recovery. The court further held that term "gross sales" was ambiguous, that the trial court had recognized as much but failed to make a finding on that question of fact, and that the cause had to be

More importantly, however, the Minnesota court's analysis of the effect of the unidentified returns policy on the wages of *individual* employees is deeply flawed. The unidentified returns policies in both *Oja* and the instant case do operate—at least to some extent—to cause forfeiture of commissions individually earned and paid to many of the sales associates. Specifically, a conscientious sales associate[10] who follows the rules for identifying himself or herself on sales documents, and processes returns correctly, has performed all necessary services and done all he or she can to ensure that he or she gets commission credit (at the rate applicable to the particular type of merchandise) for the completed sale. As to those items of merchandise the customer decides to keep, the sales associate has clearly earned his or her commission at the moment the sales documents are completed and the customer takes possession of the purchased items. As to identified returns, the sale is reversed and the individual sales associate is required to return the commission because *his or her* sale was rescinded. However, to the extent the employer deducts for unidentified returns resulting from *other*

---

remanded for additional evidence and a ruling by the trial court on what the parties' intended to constitute a "sale." (127 Cal.App.2d at p. 117.) The court left open the possibility that the employees could recover commissions for the products delivered after August 31 if the parties intended that a sale was completed at the time the employer accepted the customer's order, rather than when the executory sales contract was completely performed at the time of delivery. The resolution of this issue would turn on whether the plaintiffs' services were completed as of the time of acceptance of the order, or were required thereafter—past August 31—until the time of delivery. (*Id.* at p. 118.)

In *Division of Labor Standards Enforcement* v. *Dick Bullis, Inc., supra,* the court applied *Commeford* to an *un*ambiguous agreement under which no commission was "payable" to an automobile sales representative who voluntarily terminated her employment after seven vehicles were ordered, but before they were delivered. The court held that the agreement was enforceable, relying heavily on the fact that the sale was not complete until the employee had performed *"substantial* post-order" duties, including certain steps in completing delivery of the vehicle. (72 Cal.App.3d at p. Supp. 56.)

The holding of the court in *Prudential Ins. Co.* v. *Fromberg, supra,* was simply that it need not consider the claimed illegality of an express agreement that allowed an insurance company to deduct from the final paycheck of insurance sales agents any amounts advanced as commissions on the sale of annual insurance policies that lapsed before all of the monthly premiums had been paid. (240 Cal.App.2d at pp. 190-191, 193.) In dicta, however, the court expressed the view that the deduction was not illegal under section 221 because the insurance agent's duties were ongoing during the life of the policy, such that the return of a proportionate share of the advanced commissions was proper where the policy had lapsed and the agent's services—e.g., reminding and encouraging the insured to keep up premium payments—had not been fully performed. (240 Cal.App.2d at pp. 190-191.) In other words, the net compensation the salesperson received bore a direct relation to his or her labor, which had ended with the cancellation of the policy.

[10]There is nothing in the record of this case to indicate that appellant, and the employees he purports to represent, are other than conscientious sales associates who follow the rules Neiman Marcus has laid down for conducting sales and processing returns.

employees' "abuse,"[11] the conscientious sales associate is required to return a portion of commissions *he or she* has legitimately earned from completed sales in order to compensate Neiman Marcus for commissions paid on sales other employees did not complete—amounts that would otherwise be a business loss the conscientious sales associate has done nothing to cause. This policy of punishing all employees for the sins of a few cannot survive scrutiny under California law.

In this regard, we note that the "cause" of the unidentified return, and Neiman Marcus's intent or purpose in adopting the unidentified returns policy, are relevant to the analysis of the lawfulness of its policy. If, as Neiman Marcus has stipulated, the predominant "cause" of unidentified returns is employee abuse, a substantial portion of the 00777 deduction from the paychecks of conscientious employees is for a loss occasioned by the misconduct of other employees. Similarly, if the "cause" of the unidentified returns is *customer* neglect or abuse that is tolerated by Neiman Marcus (e.g., the customer's failure to obtain or retain the sales documents, "return" of stolen merchandise, return of merchandise they have damaged, return of merchandise more than six months after the original sales associate has left Neiman Marcus's employ), it is, again, asking conscientious employees to give up a portion of their earned commissions in order to compensate Neiman Marcus for losses occasioned by its generous returns policy.[12] This is, truly, making Neiman Marcus employees the "insurers of the employer's business losses." (*Kerr's Catering, supra,* 57 Cal.2d at p. 327.)

At bottom, the Neiman Marcus 00777 deduction offends the Labor Code in precisely the same way the bonus plan in *Quillian* did. By its terms, the unidentified returns policy calls for deductions from earned commission wages of all sales associates a sum of money representing what would otherwise be business losses occasioned by the misconduct or negligence of some of its employees and customers. The deduction is unpredictable, and is

---

[11]In the context of this case, we understand the term "abuse" to mean willful or dishonest conduct by an employee to conceal his or her identity as the original seller of the merchandise, whether at the time of the sale or upon return of the merchandise, so as to avoid a deduction from commission income.

[12]Although the Neiman Marcus returns policy is not included in the record on appeal, it is a fair inference from the record evidence and the parties' stipulation that Neiman Marcus has an extremely generous policy and/or practice of accepting returned merchandise, and that employees have no choice but to follow it. Apparently, Neiman Marcus accepts returns without a sales receipt or price ticket or other documentation to show the merchandise was sold by one of its stores in the first place. It accepts returns of nondefective custom-made and late-delivered merchandise. It accepts returns made more than six months after the original sale. It accepts returns of defective merchandise and items that have been altered for or abused by customers.

taken without regard to whether the losses were due to factors beyond the employee's control. Neiman Marcus cannot avoid a finding that its unidentified returns policy is unlawful simply by asserting that the deduction is just a step in its calculation of commission income. (*Quillian, supra*, 96 Cal.App.3d at pp. 162-163.)

Of course, Neiman Marcus is not helpless to avoid the loss attributable to commissions paid on unidentified returns. It has numerous other tools for dealing with the problem of unidentified returns including, but not limited to, careful training and supervision of all of its sales associates in sales documentation, application of its returns policy, and the processing of returns; researching Neiman Marcus copies of sales documents and time records to ascertain the identity of the sales associate who originated the sale of unidentified returns; investigation of individual employees it reasonably suspects to be engaging in "abuse" of its sales documentation policies, and discipline of those individuals in accordance with its policies on employee misconduct; and even, perhaps, deductions from wages of losses caused by "a dishonest or wilful act or by the culpable negligence of" individual employees. (*Kerr's Catering, supra*, 57 Cal.2d at p. 327; but cf. DLSE Interpretive Bull. No. 85-3 at p. 3 [employer who resorts to self-help to take such deductions does so at its own risk].) Neiman Marcus can also adjust its own returns policy by, for example, requiring a sales receipt or price ticket for any return.[13] The one tool that is *not* available to Neiman Marcus, however, is an employment agreement by which Neiman Marcus requires its employees to consent to unlawful deductions from their wages. (See *Kerr's Catering, supra*, 57 Cal.2d at pp. 322, 328; *Quillian, supra*, 96 Cal.App.3d at pp. 158, 163; see also *Barnhill v. Robert Saunders & Co., supra*, 125 Cal.App.3d at p. 6 [employers are not permitted to collect contractual indebtedness as setoff against final paycheck of terminated employee].)[14]

### B. *The Labor Commissioner's Private Opinion Letter, Which Was Issued Ex Parte to A Nonparty During The Pendency Of This Action, Is Not Controlling.*

Although it recognizes that "questions of regulatory and statutory interpretation are ultimately for the court[s] to decide," Neiman Marcus

---

[13]Although the court in *Kerr's Catering, supra*, 57 Cal.2d at page 329, disapproved deductions that were "in reality nothing more than devices to reduce the wage scale," Neiman Marcus could also adjust its commission schedules or base pay (at least for new employees), so long as it does so overtly.

[14] Because we hold that the unidentified returns deduction is unlawful, we need not address the issue whether appellant and his coworkers actually entered into an enforceable agreement regarding the use of unidentified returns in the computation of their commission wages.

devotes almost half of its brief to an argument that this court should defer to the private opinion letter issued by the Labor Commissioner in favor of CRA after the trial court had granted summary judgment for appellant. "It is a well-established rule of statutory construction that the contemporaneous and practical construction of a statute by those whose duty it is to carry it into effect, while not controlling, is always given great respect. And a contemporaneous interpretation long acquiesced in by all persons who could possibly have an interest in the matter, has been held to be sufficient to justify a court in resolving any doubt it might have as to the meaning of ambiguous language employed by the legislature, in favor of sustaining such long unquestioned interpretation. [Citation.] Under these circumstances, the administrative practice will be upheld unless it is *clearly* erroneous or unauthorized." (*Steelgard, Inc.* v. *Jannsen* (1985) 171 Cal.App.3d 79, 88 [217 Cal.Rptr. 152], internal quotation marks omitted.)

The Labor Commissioner's private ruling on the CRA unidentified returns policy can hardly be described as a "contemporaneous interpretation long acquiesced in by all persons who could possibly have an interest in the matter." Quite to the contrary, it marks a significant change of direction by the DLSE, which has heretofore consistently disapproved employer deductions for amounts that are traditionally viewed as "business losses" unless the loss is attributable to an *individual* employee who has engaged in a dishonest, willful, or grossly negligent act. (See, e.g., DLSE Operations and Procedures Manual (Sept. 1989) § 10.30; DLSE Interpretive Bull. No. 85-3; Cal. Code Regs., tit. 8, § 11070, ¶ 8 [Wage Order No. 7-80]; but cf. *id.*, ¶ 9(C) [limited exception to prohibition on deductions for business losses where employee fails to return a uniform or equipment issued by the employer, and has previously authorized the deduction in writing].) Thus, the normal rule of deference does not apply with its usual force. (See *Brewer* v. *Patel* (1993) 20 Cal.App.4th 1017, 1022 [25 Cal.Rptr.2d 65].)

The Labor Commissioner's letter was also the product of a nonadversarial, ex parte process conducted at the request of an organization that exclusively represents the interests of employers in the retail industry. All of the cases on which respondent relies for its deference argument are, thus, distinguishable in that in each case the agency's interpretation was the product of an adversary proceeding in which the administrative agency was either a party (see, e.g., *Skyline Homes, Inc.* v. *Department of Industrial Relations* (1985) 165 Cal.App.3d 239 [211 Cal.Rptr. 792]; see also *Bendix Forest Products Corp.* v. *Division of Occupational Saf. & Health* (1979) 25 Cal.3d 465 [158 Cal.Rptr. 882, 600 P.2d 1339]; *Construction Industry Force Account Council* v. *Delta Wetlands* (1992) 2 Cal.App.4th 1589 [4 Cal.Rptr.2d 43]), or had

acted as an adjudicator in the proceedings under review (see, e.g., *Aguilar* v. *Association for Retarded Citizens* (1991) 234 Cal.App.3d 21 [285 Cal.Rptr. 515]; see also *Ghory* v. *Al-Lahham* (1989) 209 Cal.App.3d 1487 [257 Cal.Rptr. 924]; *Triad Data Services, Inc.* v. *Jackson* (1984) 153 Cal.App.3d Supp. 1 [200 Cal.Rptr. 418]).

Most fundamentally, however, the Labor Commissioner's letter is simply wrong.[15] As we have discussed, it totally disregards settled principles of California law, relying instead on a single out-of-state case which is, itself, poorly reasoned. In these circumstances, we conclude that the ruling of the Labor Commissioner is not controlling.

C. *Neiman Marcus's Unidentified Returns Policy Also Violates Business And Professions Code Section 17200 Et Seq.*

Appellant further contends that, by violating section 221, Neiman Marcus's unidentified returns policy also constitutes a violation of Business and Professions Code section 17200. Neiman Marcus does not seriously dispute this point but, rather, relies on the argument that the unidentified returns policy is lawful and cannot be held to violate section 17200 merely by virtue of some perceived "unfairness." We need not reach the issue as framed by respondent because we agree with appellant that a wage policy or practice that violates the Labor Code may also be held to violate section 17200 of the Business and Professions Code.

That section prohibits all business practices that are "unlawful, unfair or fraudulent," not merely anticompetitive business practices. (*People* v. *Los Angeles Palm, Inc.* (1981) 121 Cal.App.3d 25, 32-33 [175 Cal.Rptr. 257]; see also *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817] [Unlawful business activity includes " '. . . anything that can properly be called a business practice and that at the same time is forbidden by law.' "].) More specifically for our purposes, business practices that violate the California Labor Code have also been held to violate Business and Professions Code section 17200. (*People* v. *Los Angeles Palm, Inc.*, *supra*, 121 Cal.App.3d at p. 33 [crediting tips of restaurant

[15]Given our conclusion on this issue, we need not consider appellant's motion to produce evidence (Code Civ. Proc., § 909), which he contends supports a finding that the Labor Commissioner, Victoria Bradshaw, had an actual, undisclosed conflict of interest (Gov. Code, § 87100) that disqualified her from participating in the decision on the unidentified returns policy submitted by CRA for review. Accordingly, we deny appellant's motion to produce evidence on appeal. We also express no opinion on the issue whether the Labor Commissioner's letter was the product of a "rule-making" procedure that was subject to, but did not comply with, the California Administrative Procedures Act. (Gov. Code, § 11340 et seq.)

employees against their minimum wage, violates both § 351 and Bus. & Prof. Code, § 17200]; *United Farm Workers of America* v. *Superior Court* (1975) 47 Cal.App.3d 334, 344-345 [120 Cal.Rptr. 904].) Thus, although it is not clear how it advances his cause, appellant is also entitled to judgment that the Neiman Marcus unidentified returns policy violates Business and Professions Code section 17200.

## III. CONCLUSION

For all the foregoing reasons, the judgment of the trial court is reversed and the cause remanded with directions to enter an order granting summary adjudication for appellant on the issue of Neiman Marcus's liability for violating section 221 and Business and Professions Code section 17200. Costs to appellant.

Kline, P. J., and Smith, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 10, 1995.