[No. S128576. Aug. 23, 2007.]

EDDY KORKIAT PRACHASAISORADEJ, Plaintiff and Appellant, v.
RALPHS GROCERY COMPANY, INC., Defendant and Respondent.

220

## COUNSEL

Kumetz & Glick, Law Offices of Stephen Glick, Fred Kumetz, Stephen Glick; Law Offices of Ian Herzog, Ian Herzog; Daniels, Fine, Israel & Schonbuch, Paul R. Fine, Scott A. Brooks and Craig S. Momita for Plaintiff and Appellant.

Goldstein, Demchak, Baller, Borgen & Dardarian, Laura L. Ho and Nina Ravin for Asian Law Caucus, Inc., Asian Pacific American Legal Center, Golden Gate Women's Employment Rights Clinic, La Raza Centro Legal, Inc., The Legal Aid Society–Employment Law Center and Stanford Community Law Clinic as Amici Curiae on behalf of Plaintiff and Appellant.

Evan D. Marshall for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Thelen Reid & Priest, Thomas E. Hill, Robert Spagat; Horvitz & Levy, Barry R. Levy and Daniel J. Gonzalez for Defendant and Respondent.

Gibson, Dunn & Crutcher, Deborah J. Clarke, Elisabeth C. Watson and Lisa A. Barr for Employers Group and California Employment Law Council as Amici Curiae on behalf of Defendant and Respondent.

Littler Medelson, J. Kevin Lilly, Diane Kimberlin and James E. Hart for California Grocers Association as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**BAXTER, J.**—We confront a significant question of California wage law. Defendant Ralphs Grocery Company, Inc. (Ralphs), a supermarket chain, implemented a written incentive compensation plan (ICP or Plan) whereby certain employees of each store were eligible to receive, over and above their regular wages, supplementary sums based upon how the store's actual Plan-defined profits, if any, for specified periods compared with preset profitability targets. For both target and actual purposes, profits were determined by subtracting store operating expenses from store revenues. Plaintiff claims the Plan's formula for calculating these supplemental profit-sharing payments thus violated California statutes, rules, and decisions that prohibit an employer from shifting certain of its costs to employees by withholding, deducting, or recouping them from wages or earnings, or otherwise obliging employees to contribute to them.

Labor Code section 221[1] provides that, except for deductions expressly authorized by state or federal law (see § 224), an employer may not "collect or receive from an employee any part of wages theretofore paid." Section 3751, subdivision (a) prohibits an employer from "exact[ing] or receiv[ing] . . . any employee . . . contribution," or "tak[ing] any deduction from [employee] earnings . . . , either directly or indirectly, to cover the whole or any part of the cost of [workers'] compensation." Case law has interpreted various provisions of the Labor Code, and regulations issued thereunder, as prohibiting deductions from an employee's stated wage to cover certain of the employer's business costs, such as cash and merchandise losses not caused by the employee's dishonesty, or his willful or grossly negligent act. A wage order of the Industrial Welfare Commission (Commission) expressly forbids such deductions and charges against the wages of so-called nonexempt employees in the mercantile industry. (Cal. Code Regs., tit. 8, § 11070, subd. 8 (Regulation 11070).)

---

[1] All subsequent unlabeled statutory references are to the Labor Code.

Deeming its decision compelled by prior case law, by section 3751, and by Regulation 11070, the Court of Appeal in *Ralphs Grocery Co. v. Superior Court* (2003) 112 Cal.App.4th 1090 [5 Cal.Rptr.3d 687] (*Ralphs Grocery*) held that the profit-based supplementary ICP we consider here was invalid insofar as it considered a store's costs for workers' compensation when computing the store profit on which Plan payments were calculated. Moreover, *Ralphs Grocery* concluded, the Plan was invalid as to nonexempt employees insofar as it factored cash shortages and merchandise damage and loss into the profit calculation. By doing so, *Ralphs Grocery* reasoned, the Plan effectively charged back a portion of such costs to employees through deductions from their wages.

On the authority of *Ralphs Grocery*, the instant Court of Appeal reversed a trial court judgment for Ralphs, entered after Ralphs's demurrer to plaintiff's complaint was sustained without leave to amend. We must now decide whether these latter decisions are correct.

After a careful examination of the relevant statutes, regulation, and judicial decisions, we reach a result largely contrary to the holdings of *Ralphs Grocery* and the instant Court of Appeal. As we will explain, nothing in those authorities suggests that an employer violates California wage-protection laws by providing, as Ralphs did, supplementary compensation designed to reward employees, over and above their regular wages, if and when their collective efforts produced a positive financial result for the store where they worked.

As described in plaintiff's complaint, the ICP did not create an expectation of or entitlement to a specified wage, then take deductions or contributions from that wage to reimburse Ralphs for its business costs. At the outset, all Plan participants received, regardless of the store's performance, their guaranteed normal rate of pay—the dollar wage they were promised and expected as compensation for carrying out their individual jobs. Over and above this regular wage, participants in the Plan understood that their collective entitlement to incentive compensation payments, and the amounts thereof, arose only under a formula that compared the store's actual Plan-defined profit, if any, for a specified period, with target figures previously set by the company. Once the amount of an employee's ICP compensation was calculated under this formula, Ralphs did not reduce it by taking unauthorized deductions, contributions, or charges.

The Plan was not illegal, we conclude, simply because, pursuant to normal concepts of profitability, ordinary business expenses, such as storewide workers' compensation costs, and storewide cash and merchandise losses, were figured in, along with such other store expenses as the electric bill and the cost of goods sold, to determine the store's profit, upon which the

supplementary incentive compensation payments were calculated. By doing so, Ralphs did not illegally shift those costs to employees. After fully absorbing the expenses at issue, Ralphs simply determined what remained as profits to share with its eligible employees in addition to their normal wages.

In sum, we are persuaded that the reasoning of *Ralphs Grocery* is flawed, and the authorities on which that decision relied are distinguishable. Ralphs's ICP, as described in plaintiff's complaint, was not illegal on the grounds plaintiff asserts. We will therefore reverse the instant Court of Appeal judgment.

## FACTS AND PROCEDURAL BACKGROUND

In 2001, plaintiff, a produce manager in a Ralphs store, filed original and first amended complaints against Ralphs, on behalf of himself and other similarly situated Ralphs employees. The complaints alleged that, in addition to their regular wages, the relevant employees were paid supplementary compensation calculated on the basis of the net earnings of the store where they worked, and that the pertinent earnings figures were reduced—illegally for this purpose—by the store's expenses for cash shortages, damaged or lost merchandise, workers' compensation, tort claims by nonemployees, and other business expenses beyond the employees' control.

This formula, the complaints asserted, violated wage-protection rules set forth in Labor Code sections 221, 400 through 410, and 3751, Regulation 11070, and associated cases, and was thus an unfair business practice prohibited by section 17200 of the Business and Professions Code. The complaints sought injunctive relief, restoration of lost wages, interest, and attorney fees.

Ralphs removed the case to federal court on grounds that plaintiff's compensation, including the incentive portion thereof, was governed by his union's collective bargaining agreement (CBA), and that the state-law claims were thus preempted by section 301 of the Labor Management Relations Act (LMRA) (29 U.S.C. § 185(a).) On plaintiff's motion, the district court remanded the case, finding that no federal question was presented, because the claims arose under state law independent and irrespective of the CBA.

Following the remand, plaintiff filed a second amended complaint for himself and an alleged class of Ralphs employees covered by the Plan. This complaint alleged, as before, that the incentive compensation payments were calculated on the basis of the respective net earnings of the store where the covered employees worked, and that the net earnings figures used for this purpose were derived by subtracting, among other expenses, "workers'

compensation claims and/or other losses" such as cash shortages, merchandise shortages or shrinkage, and the costs of nonemployee tort claims, "not caused by the willful or dishonest act(s) or gross negligence of" the individual employees whose compensation was thereby diminished.

"Through this method of compensation," the second amended complaint asserted, Ralphs "wrongfully deduct[s] expenses from the wages of [its] employees, including [p]laintiff, which expenses the law requires . . . to be borne by the . . . employer[]. In other words, [the employees] are forced to carry the burden of losses from their respective stores in violation of" Labor Code sections 221, 400 through 410, and 3751, Business and Professions Code section 17200, and Regulation 11070. The complaint sought injunctive relief, classwide lost wages according to proof, waiting time penalties, damages, disgorgement of wrongful profits, and fees and costs.

Ralphs demurred to the second amended complaint on grounds that the claims (1) were preempted by the LMRA and (2) did not allege violations of state law in any event. As to the latter issue, Ralphs asserted that incentive compensation, paid over and above the regular wage, and openly contingent on the achievement of profitability goals, as profitability is normally defined, does not constitute an improper charge against, or deduction from, wages in violation of the Labor Code.[2]

The trial court sustained the demurrer, finding the claims preempted by federal law. As a consequence, it did not decide whether they would otherwise be viable as a matter of state law. A judgment of dismissal was entered accordingly.

---

[2] In opposition to Ralphs's demurrer, plaintiff asked the trial court to take judicial notice of the 1999, 2000, and 2001 versions of Ralphs's "Semiannual Incentive Compensation Program for Store Teams." Copies of these plans are thus included in the appellant's appendix on appeal, though the trial court never formally ruled on the motion for judicial notice. The plan's provisions are stated in extremely technical terms. In its opening brief on the merits in this court, Ralphs describes the operation of the plans at issue as follows: "Ralphs calculated a target bonus for an employee that was a percentage of the employee's regular wages. . . . Ralphs also set target earnings or profits for the employee's store ('Earnings Before Interest, Taxes, Depreciation and Amortization' or 'EBITDA'). The employee's actual bonus was the target bonus adjusted up or down under a detailed formula set forth in the plan. First, the formula compared a store's target earnings against actual earnings. Then, to the extent actual earnings met, exceeded, or fell below the target earnings, the plans applied the ratio of the actual to target earnings to increase or decrease the target bonus, thereby determining the actual bonus. The actual bonus could range from 0% to 150% of the target bonus. Ralphs' collective bargaining agreement with [plaintiff's] union permitted payment of this bonus compensation in addition to the union negotiated wages." Though plaintiff disputes the legal consequences of a plan that operates in this manner, he does not materially dispute Ralphs's description of its operation.

Plaintiff appealed. The Court of Appeal for the Second Appellate District, Division Two, reversed. Contrary to the trial court, the Court of Appeal held that plaintiff's claims did not depend on construction or application of the CBA, but arose under independent provisions of state law, and were thus not preempted by the LMRA. Then, addressing the issue left undecided by the trial court, the Court of Appeal applied *Ralphs Grocery, supra,* 112 Cal.App.4th 1090, to conclude that the second amended complaint's allegations of state law violations were sufficient to withstand demurrer. The Court of Appeal remanded for proceedings consistent with its opinion.

We granted Ralphs's petition for review, limiting the issues to the following: Does an employee bonus plan based on a profit figure that is reduced by a store's expenses, including the cost of workers' compensation insurance and cash and inventory losses, violate (a) Business and Professions Code section 17200, (b) Labor Code sections 221, 400 through 410, or 3751, or (c) Regulation 11070? We turn to that question.

## DISCUSSION

■ As noted above, section 221 provides that an employer may not "collect or receive from an employee any part of wages theretofore paid by said employer to said employee." "Wages" for this purpose "includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." (§ 200, subd. (a).)[3]

■ Section 3751, subdivision (a), makes it a misdemeanor for an employer to "exact or receive from any employee any contribution, or make or take any deduction from the earnings of any employee, either directly or indirectly, to cover the whole or any part of the cost of [workers'] compensation."

■ Regulation 11070—a Commission wage order covering "mercantile industry" workers except those "exempt" employees in administrative, executive, or professional positions (*id.,* subd. 1)—provides that "[n]o employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or

---

[3] Section 221 does not preclude deductions required or authorized by federal or state law, or for medical insurance premiums and welfare and pension contributions authorized in writing by the employee, or by the terms of a collective bargaining agreement. (§ 224.)

willful act, or by the gross negligence of the employee." (*Id.*, subd. 8.) The order defines "wages" as in section 200, subdivision (a). (Reg. 11070, subd. 2(*O*).)[4]

Under these laws, plaintiff urges, the profitability figure on which, under Ralphs's ICP, supplementary profit-based incentive compensation was calculated could not be reduced by the employer's workers' compensation expenses, or by cash shortages, the costs of merchandise damage or loss, or third party tort claims not attributable to the eligible employee's own dishonesty, willfulness, or gross negligence. Otherwise, plaintiff contends, the employee's stated and expected wage was subject to an unanticipated contribution, deduction, withholding, and/or reimbursement to the employer for expenses beyond the employee's control, which the law requires the employer to bear on its own.

■ Plaintiff's contention depends entirely on the meaning of the statutes and regulation we have noted above. Whenever we construe such a provision, we look first to its words, assigning them their usual and ordinary meanings, and reading them in context. If the words themselves are clear, we assume they mean what they say, and the plain meaning governs. If the language allows more than one reasonable construction, we may consider extrinsic aids to construction, including the impact of a particular interpretation on public policy. (E.g., *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 [56 Cal.Rptr.3d 880, 155 P.3d 284]; *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190 [48 Cal.Rptr.3d 108, 141 P.3d 225].) ■ Because the laws authorizing the regulation of wages, hours, and working conditions are remedial in nature, courts construe these provisions liberally, with an eye to promoting the worker protections they were intended to provide. (E.g., *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794 [85 Cal.Rptr.2d 844, 978 P.2d 2].)

---

[4] The original and first amended complaints described plaintiff as a store produce manager. The second amended complaint does not state his job. Nor does it specify each employee classification to which the plan applies or applied. It simply alleges that plaintiff is a member, and a representative, of a class comprised of "all employees who have worked for [d]efend-ant[] within the State of California, including, but not limited to, operating managers, assistant managers, general managers, market managers, district managers, and/or operations managers, grocery managers, produce managers, meat managers, fish managers, service deli managers, bakery managers, floral managers, deli managers, liquor managers, and all other employees who were paid a bonus" pursuant to the Plan. Ralphs has not argued that plaintiff is an administrative, executive, or professional employee exempt from the Commission wage order. We therefore have no occasion to determine whether the specific provisions of the order are inapplicable to plaintiff.

Here we must determine, under the requisite statutes and regulation, whether Ralphs's ICP withheld, or otherwise took, received, exacted, or collected impermissible "deductions" or "contributions" from Ralphs employees, or from their "earnings" or "wages," to "reimburs[e]" Ralphs, in whole or in part, for business expenses the law required Ralphs to bear on its own.

As noted above, a "wage" for this purpose is "[any] amount [paid] for [an employee's] labor," however that amount is calculated. (§ 200.) "Earnings" are "[t]he salary or wages of a person." (American Heritage Dict. (2d college ed. 1985) p. 434.) To "deduct" is to "take away [one amount] from another"; to "subtract." (*Id.* at p. 373.) "Deduction" is "[t]he act of deducting," or "[a]n amount that is . . . deducted." (*Ibid.*) A "contribution" is "something contributed;" while to "contribute" is "[t]o give . . . in common with others [or] to a common fund or for a common purpose." (*Id.* at p. 318.)

■ Under these common definitions, an employee's "wages" or "earnings" are the amount the employer *has offered or promised to pay*, or *has paid pursuant to such an offer or promise*, as compensation for that employee's labor. The employer takes a "deduction" or "contribution" from an employee's "wages" or "earnings" when it subtracts, withholds, sets off, or requires the employee to return, a portion of the *compensation* offered, promised, or paid as offered or promised, so that the employee, having performed the labor, actually receives or retains less than the *paid, offered, or promised compensation*, and effectively makes a forced "contribution" of the difference.

Here, each Ralphs store employee was offered, promised, and paid, as full compensation for his or her individual work, an agreed and guaranteed dollar wage, which did not vary with the store's financial fortunes, and from which no unauthorized amounts were deducted, withheld, set off, or otherwise received or collected back by the employer.[5] In addition, Ralphs then sought, through the Plan, to encourage and reward certain employees' cooperative and collective contributions to the profitable performance of their stores by sharing with these employees, in addition to their regular wages, a portion of the profits, if any, their efforts had produced, and which Ralphs would otherwise be entitled to retain for itself.

---

[5] As plaintiff acknowledged in the Court of Appeal, the ICP payments did not reduce the union-negotiated regular wage payable to Plan participants, and the relevant CBA expressly provided that payments under the Plan would not be used to offset regular wages. Plaintiff also does not contend that the regular, guaranteed wage received by any Plan participant fell below the applicable federal or state minimum wage.

Employees' expectations with respect to these supplementary payments—i.e., what Ralphs offered or promised to pay—derived exclusively from the terms of the Plan itself. By these terms, an individual store employee's entitlement to a periodic incentive compensation payment, and the amount of any such payment, depended fundamentally on (1) whether the store's overall operations for the period had been profitable, as the Plan defined profitability, and (2) how any such profit compared to goals or targets previously set for the store. The *first and most basic step* in determining whether, and to what extent, supplementary incentive compensation payments were due to store employees was to ascertain whether the store had registered a Plan-defined profit for the relevant period.

Under the Plan formula, the relevant profit figure was calculated by subtracting various store expenses from store revenues. The record contains no exhaustive catalog of the expenses considered—we may infer that " ' "[i]nterest, [t]axes, [d]epreciation, and [a]mortization" ' " were *not* among them (see fn. 2, *ante*)—but, pursuant to usual accounting principles, the included items presumably encompassed such day-to-day operating expenses as the store's cost of goods sold, its payroll, its utility bills, any rent paid for the store premises, and the like. They similarly included the store's expenses for workers' compensation, cash shortages, merchandise losses, and third party tort claims not traceable to the gross negligence, dishonesty, or willful misconduct of individual employees subject to the Plan.

By the Plan's terms, it was *only after* the store had completed the relevant period of operation, and the resulting profit or loss figure was then derived, that it was possible to determine, by a further comparison to the preset targets, whether Plan participants were entitled to a supplementary incentive compensation payment, and if so, how much. This final figure, and this figure only, once calculated, was the amount offered or promised as compensation for labor performed by eligible employees, and *it thus represented their supplemental "wages" or "earnings."*

Plaintiff concedes Ralphs followed the Plan to the letter, and paid all amounts due thereunder, exactly as provided. He does not claim Ralphs received, deducted, withheld, set off, or otherwise exacted any unauthorized amount from any employee's supplementary incentive compensation as finally computed and paid under the Plan.

Plaintiff nonetheless insists the Plan violated the law because, by subtracting workers' compensation costs, and damage or loss expenses beyond individual employees' control, from the store's revenues to determine the profit figure on which supplementary incentive compensation payments were calculated, the Plan reduced, to that extent, the "wages" or "earnings" otherwise due. Accordingly, plaintiff asserts, Ralphs effectively shifted to employees, by virtue of deductions from their expected wages, costs the law requires the employer to bear on its own. We disagree.

For his premise, plaintiff, like the Courts of Appeal here and in *Ralphs Grocery, supra,* 112 Cal.App.4th 1090, invokes a body of California case law that has developed around some of the statutes and regulations quoted above, or closely analogous ones. As we shall explain, however, the cited decisions are inapposite to this profit-based ICP.

The line of cases on which plaintiff relies begins with a 45-year-old decision of this court, *Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319 [19 Cal.Rptr. 492, 369 P.2d 20] (*Kerr's Catering*). There, each of the employer's female lunch-truck drivers was entitled to receive, as part of her compensation, a 15 percent commission on her own sales exceeding $475 per week. However, the promised commission was subject to reduction for any cash shortage attributable to the driver for the month. The employer computed the cash shortage figure by comparing, at the end of each day, the driver's cash receipts and remaining inventory against inventory on the truck at the beginning of the day. The amount, if any, by which the latter exceeded the former was the daily shortage.

The Division of Industrial Welfare notified the employer that this practice violated Wage Order No. 5-57, which, in terms essentially identical to those of current Regulation 11070, prohibited "deduction[s]" from wages for cash shortages, breakage, or loss of equipment not caused by the employee's dishonesty, willful act, or culpable negligence. (*Kerr's Catering, supra,* 57 Cal.2d 319, 322.) The employer sued for injunctive and declaratory relief, urging that Wage Order No. 5-57 exceeded the Commission's authority. The trial court entered judgment for the employer, and this court reversed.

Our opinion first noted the parties' agreement that the Commission's power derived from former section 1182,[6] which authorized the Commission to "fix" the "minimum wage" (former § 1182, subd. (a)), maximum hours (*id.,* subd. (b)), and "standard conditions of labor" (*id.,* subd. (c)) for women and

---

[6] See now section 1173.

minors. (*Kerr's Catering, supra,* 57 Cal.2d 319, 323.) Because the drivers earned more than the minimum wage independent of the sales commission, the issues presented were whether, under subdivision (c), the Commission could regulate "standard conditions of labor" insofar as they affected wages beyond the minimum wage, and, if so, whether the deduction of cash shortages from the drivers' sales commissions was a condition subject to regulation under subdivision (c).

The court disposed of the first issue easily. It concluded that subdivision (c) allowed the Commission to regulate "standard conditions of labor" in ways that affected, but did not "fix," wages above the statutory minimum and hours below the statutory maximum. (*Kerr's Catering, supra,* 57 Cal.2d 319, 323–325.)

Addressing the second issue, the court cited multiple provisions of the Labor Code to justify the Commission's regulation of loss, breakage, and shortage deductions from employee wages. First, the court observed, the public policy of special protection for wages generally had been expressed in numerous statutes and decisions that required the prompt and full payment of wages due, as the employee's exclusive property, and imposed limitations on the ability of creditors, including the employer itself, to satisfy unliquidated claims against the employee by using garnishment, assignment, or accord and satisfaction to appropriate wages otherwise due. (*Kerr's Catering, supra,* 57 Cal.2d 319, 325–327.)

*Kerr's Catering* noted in particular that the deductions taken from the sales commissions there at issue extended to shortages beyond the driver's control, or the result of mere simple negligence. Hence, the court reasoned, these deductions effectively made her an insurer of the employer's merchandise and served the same purpose as an employee's bond to cover such losses. Accordingly, they contravened "the spirit, if not the letter, of the Employee's Bond Law" (see §§ 400–410), which states the exclusive conditions under which employers may require employees to furnish such cash undertakings. (*Kerr's Catering, supra,* 57 Cal.2d 319, 328.)

The court suggested that employers, exploiting their superior position, could also use such deductions to defraud employees by withholding inflated and exorbitant amounts, thus effectively reducing the wage scale. Such concerns, said the court, underlie section 221, which was adopted to prevent the use of secret deductions or "kickbacks" to make it appear the employer is paying a required or promised wage, when in fact it is paying less. (*Kerr's Catering, supra,* 57 Cal.2d 319, 328.)

"A further reason for legislative disapproval of deductions," the court observed, "exists in the reliance of the employee on receiving his expected wage, whether it be computed upon the basis of a set minimum, a piece rate, or a commission. To subject that compensation to unanticipated or undetermined deductions is to impose a special hardship on the employee." (*Kerr's Catering, supra,* 57 Cal.2d 319, 329.)

Finally, the court rejected the employer's complaint that Wage Order No. 5-57 unfairly placed the burden of the cash shortages on the employer. The court explained that "some cash shortages, breakage and loss of equipment are inevitable in almost any business operation. It does not seem unjust to require the employer to bear such losses as expenses of management when it is presently the unchallenged practice [also pursuant to Wage Order No. 5-57] to require him to bear, as a business expense, the cost of tools and equipment, protective garments and uniforms furnished to the employee by prohibiting . . . deductions for these costs. [¶] Furthermore, the employer may, and usually does, either pass these costs on to the consumer in the form of higher prices *or lower his employees' wages proportionately, thus distributing the losses among a wide group.*" (*Kerr's Catering, supra,* 57 Cal.2d 319, 329, italics added.)

In *Quillian v. Lion Oil Company* (1979) 96 Cal.App.3d 156 [157 Cal.Rptr. 740] (*Quillian*), the plaintiff managed two of defendant's self-service gasoline stations. Her mandatory employment agreement included provision for a manager's incentive bonus in addition to her modest base pay. The bonus, intended to encourage managerial efforts to increase sales and reduce losses, was defined as a dollar amount based on the volume of gasoline sold at the stations, plus a flat 1 percent of the stations' nongasoline sales, less the full dollar amount of cash and merchandise shortages at the stations.[7]

In a suit for unpaid wages attributable to the shortages, the trial court entered judgment for the plaintiff. The Court of Appeal affirmed. Noting the Labor Code's prohibition of deductions from wages (§ 221), the court held that under *Kerr's Catering*, reduction of the promised bonus by shortages applicable to the stations under the plaintiff's supervision constituted an illegal charge against employee earnings, and made her an insurer of the employer's merchandise, in violation of the employees bond law. (*Quillian, supra,* 96 Cal.App.3d 156, 163.)

---

[7] In other words, the *full amount* of the stations' cash and merchandise shortages, however and by whomever caused, were subtracted *dollar for dollar* to arrive at this single employee's final bonus. Thus, against a *percentage* of the stations' sales revenues, she alone shouldered the entire burden of their losses and shortages to the extent of the bonus otherwise payable.

The employer argued that there were no *deductions* from the plaintiff's wages, because the actual amount of the wage, in the form of the bonus, was determined only after losses and shortages were applied against volume and sales figures. Once so determined, the employer insisted, the wage was paid without deduction. The Court of Appeal deemed this a mere circumvention. In reality, the court observed, the bonus was a commission—a scheduled amount based on sales volume and revenue. To the extent cash and merchandise shortages were charged against this scheduled amount, said the court, the result was the same as in *Kerr's Catering*—the employee carried the burden of the employer's losses and suffered the "special hardship" of "unanticipated" or "undetermined" deductions from the set wage. (*Quillian, supra,* 96 Cal.App.3d 156, 163.)

Again citing *Kerr's Catering*, the court stressed that placing the burden of cash and merchandise shortages on the employer was not unjust, because the employer could pass the cost on to customers " 'or lower [its] employees' wages proportionately, thus distributing the losses among a wide group.' " (*Quillian, supra,* 96 Cal.App.3d 156, 162, quoting *Kerr's Catering, supra,* 57 Cal.2d 319, 329.)

In *Hudgins v. Neiman Marcus Group, Inc.* (1995) 34 Cal.App.4th 1109 [41 Cal.Rptr.2d 46] (*Hudgins*), sales associates for a department store chain were paid commissions on their individual "net sales." (*Id.* at p. 1113.) Associates received advances, or draws, against commissions, subject to charge-backs against future draws if actual commissions, as finally determined, fell short of the amounts previously advanced. Until 1986, an associate's net sales were defined as his or her gross sales, less (1) gift wrap and alterations on those items and (2) "identified returns"—i.e., goods returned during the pay period which could be identified as sold by that employee. In 1986, after obtaining associates' signed acknowledgements of the new policy, the employer began charging back, against each associate's earned commissions on his or her own net sales, a pro rata share of advance commissions deemed to have been paid on "unidentified returns"—i.e., returned merchandise as to which, for whatever reason, the selling employee could not be determined.

Plaintiff, a sales associate subjected to this policy, sued for himself and others to obtain lost wages and other relief, claiming that the deduction for unidentified returns violated section 221. The trial court granted summary judgment for the employer. The Court of Appeal reversed.

Deeming the case governed by *Kerr's Catering* and *Quillian*, the Court of Appeal held that the deduction from employees' earned commissions on valid sales to reimburse the employer for the cost of unidentified returns violated section 221, sections 400 through 410, and pertinent wage orders such as

Regulation 11070. These provisions, said the court, have "long been held to prohibit deductions from an employee's wages for cash shortages, breakage, loss of equipment, and other business losses that may result from the employee's simple negligence. [Citations.]" (*Hudgins, supra,* 34 Cal.App.4th 1109, 1118.)

The court explained that insofar as the inability to identify which associate had sold the returned merchandise was the result of that employee's record-keeping negligence, conscientious employees were giving up their own earned commissions to cover losses occasioned by the misconduct of others. Conversely, said the court, if the cause of the unidentified return was *customer* neglect, abuse, or dishonesty, conscientious employees were sacrificing their own earned commissions to compensate the employer for losses occasioned by its generous return policy.

Either way, the court concluded, "employees [were made] the 'insurers of the employer's business losses' " (*Hudgins, supra,* 34 Cal.App.4th 1109, 1123) and were subjected to unpredictable deductions from their wages for losses due to factors beyond their control (*id.* at pp. 1123–1124). As in *Quillian,* the court further admonished, the employer could not defend the lawfulness of its policy on grounds that "the deduction is just [one] step in its calculation of commission income. [Citation.]" (*Hudgins, supra,* at p. 1124.)

*Ralphs Grocery, supra,* 112 Cal.App.4th 1090, presented the precise issue we address in this case—whether a cause of action arose for wages improperly withheld under Ralphs's ICP. As here, the plaintiff sought to represent a class of both exempt and nonexempt Ralphs employees. As here, the complaint alleged that by charging storewide expenses of workers' compensation, cash shortages, and merchandise losses against storewide revenues to obtain the store net earnings figures on which supplementary incentive compensation payments were calculated, the plan violated sections 221, 400 through 410, and 3751, and Regulation 11070. The trial court overruled Ralphs's demurrer. Ralphs sought mandate, and the Court of Appeal denied relief.

The *Ralphs Grocery* court observed at the outset that Ralphs had persuasively demonstrated the beneficial effects of profit-based incentive compensation plans for both employers and employees. Moreover, after reviewing *Kerr's Catering, Quillian,* and *Hudgins,* the court acknowledged Ralphs had shown that, "as a matter of economics, calculation of an incentive bonus based on profitability by taking into account not only revenues but also store expenses in accordance with standard accounting principles differs markedly from reducing (or recapturing) wages through prohibited deductions." (*Ralphs Grocery, supra,* 112 Cal.App.4th 1090, 1101.)

Nonetheless, the court in *Ralphs Grocery* felt compelled to conclude that the ICP was, in certain respects, illegal. By including workers' compensation costs in the formula for calculating the store's net earnings on which supplementary incentive compensation payments were based, the Court of Appeal held, Ralphs was taking a deduction from employee wages to cover such costs, in direct violation of section 3751. Moreover, the court concluded, insofar as the net earnings calculation took into account cash shortages, breakage, and loss of equipment not caused by the compensated employee's dishonesty, willful act, or gross negligence, the plan violated Regulation 11070 as applicable to nonexempt employees. This formula, said the court, forced such workers to assume business costs the law places exclusively upon the employer, and to face the "special hardship" of uncertain and unanticipated wage deductions.

On the other hand, *Ralphs Grocery* held, no law prevented consideration of cash, merchandise, and equipment losses in calculating the supplementary incentive compensation payments of exempt, or managerial, employees not covered by Regulation 11070. Neither in letter nor in spirit, said the Court of Appeal, did such a formula resemble the "recapture" of wages already paid, as prohibited by section 221, or the exaction of an employee cash bond governed by sections 400 through 410. (*Ralphs Grocery, supra,* 112 Cal.App.4th 1090, 1105.)

*Kerr's Catering,* the court noted, had suggested that losses of these kinds were "expenses of management," thus implying it was appropriate for managerial employees to bear some of the costs associated with their supervision and oversight of business operations. Such a system is fair and comports with common sense, the court observed, because managers have control of business operations that may affect both revenues and expenses. "At the very least," said the court, "it would require a significant extension of the Supreme Court's dicta [in *Kerr's Catering*] regarding the underlying spirit of the Labor Code provisions protecting workers' wages to conclude an incentive compensation plan that determines an exempt employee's bonus on a full range of revenue and expense items, including cash shortages, is unlawful." (*Ralphs Grocery, supra,* 112 Cal.App.4th 1090, 1106.)[8]

---

[8] Though *Ralphs Grocery* did not expressly disagree with *Quillian, supra,* 96 Cal.App.3d 156, as to the rights of managerial employees, the two decisions are at odds on the point. *Quillian* involved a managerial employee, and no Commission wage order was cited there as a source of her rights. Instead, *Quillian* held that the deduction of cash and merchandise losses from a manager's incentive pay contravened sections 400 through 410, and insinuated that it might also violate section 221.

We entirely agree with this latter observation, but it leads us to conclude, contrary to *Ralphs Grocery*, that Ralphs's ICP is not illegal *in any respect*. To paraphrase *Ralphs Grocery*, the Plan does not resemble, in letter or spirit, the prohibited deduction, setoff, or recapture of expected wages for the purpose of saddling employees with prohibited employer costs, as was at issue in *Kerr's Catering*, *Quillian*, and *Hudgins*. For similar reasons, the Plan does not produce, in violation of section 3751, a prohibited direct or indirect deduction or contribution from employee wages to cover the costs of workers' compensation. Plaintiff and his amici curiae are incorrect when they argue that Ralphs's ICP is simply a relabeled version of the wage-deduction schemes addressed in *Kerr's Catering*, *Quillian*, and *Hudgins*.[9]

In each of those cases, the employee's compensation, whether regular or supplementary, was set, in essence, as a sales commission, i.e., a specified and promised share of the revenues attributable to that employee's personal sales or managerial efforts. The set commission was then directly reduced by the full dollar value of merchandise and cash losses, as determined by the employer, and regardless of employee fault. The employer thus defrayed its merchandise and cash losses by charging them, dollar for dollar, against its liability for wages. Without following the rules for cash bonds, the employer assessed individual employees the entire unliquidated value of such losses, and did so by withholding amounts from earned and promised commissions until those commissions fell to zero. By this means, the employer reduced individual employees' wages to increase its own retained profits. This is the practice the statutes, regulations, and cases have prohibited.

Here, unlike in *Kerr's Catering*, *Quillian*, and *Hudgins*, no employee was offered or promised a specified bonus or commission that was based upon, and immediately measurable by, his or her individual sales or managerial efforts, but was then subject to deductions to cover employer costs. Instead, under the ICP, all eligible employees' supplementary incentive compensation was equally and collectively premised, at the outset, on *store profits*, a factor that necessarily considers the employer's expenses as well as its income.

---

[9] Two amicus curiae briefs were submitted on behalf of plaintiff—one by Consumer Attorneys of California, and one on the collective behalf of Asian Law Caucus, Inc., Asian Pacific American Legal Center, Golden Gate Women's Employment Rights Clinic, La Raza Centro Legal, Inc., The Legal Aid Society—Employment Law Center, and Stanford Community Law Clinic. The latter amici curiae are referred to collectively in the text as Asian Law Caucus, Inc., et al. Amicus curiae briefs were submitted on behalf of Ralphs by (1) California Grocers Association and (2) Employers Group and California Law Council.

Employees understood from the beginning that, by the Plan's very nature, supplementary incentive compensation for a particular period depended on the extent to which the store's revenues for the relevant period exceeded its operating expenses, as defined in the Plan. Amounts calculated as a percentage of the store's Plan-defined profit were the only "wages" or "earnings" offered or promised to eligible employees under the Plan. Ralphs took no unauthorized deductions or contributions, direct or indirect, from the wages so offered or promised. If there was uncertainty in the amount ultimately due, it arose, not from employer charge-backs taken *after* the basic Plan wage was determined, but inherently from the basis on which Plan compensation was awarded.

Thus, employees suffered neither a prohibited recapture of compensation already offered, promised, or paid, nor an uncertain or unanticipated deduction from expected wages. And because they attained no interest or entitlement in any supplementary compensation other than that finally calculated under the Plan, they made no forced "contribution," direct or indirect, from their own resources to reimburse Ralphs for costs the law requires the employer to bear alone.

The supplementary incentive compensation promised or offered under the Plan was collective in nature, intended to promote and reward employee teamwork that produced a net profit for the store as a whole. This necessarily entailed not only increasing the store's overall sales, but reducing its overall costs, including those arising from workers' compensation, and losses of cash and merchandise. The Plan contemplated that this was an effort in which all eligible employees could and should be involved. To encourage and reward their participation, the Plan offered them, over and above their regular wages, a proportionate stake in the successful result.

We cannot conclude that such a supplementary incentive compensation system, beneficial to both employer and employees (see *Ralphs Grocery*, *supra*, 112 Cal.App.4th 1090, 1101), contravenes the wage-protection policies of the Labor Code and Regulation 11070. Considering the "marked[]" economic difference between Ralphs's plan and the compensation systems at issue in *Kerr's Catering*, *Quillian*, and *Hudgins* (*Ralphs Grocery*, *supra*, at p. 1101), a holding that those decisions govern here would defy reason and common sense.

First, insofar as the law precludes the employer from using wages to shift business losses to employees, or to make employees the insurers of such losses, Ralphs did not do so here. Under the ICP, Ralphs absorbed all store costs, and took them as full charges against its own profits. As the Plan specified, Ralphs then simply determined if there remained any profit to split with its employees.[10]

Nor did Plan participants become prohibited insurers of Ralphs's workers' compensation expenses, or of its cash shortages and merchandise losses, simply because the level of a store's expenses in these categories might have the effect of raising or lowering the wages or earnings ultimately offered or promised to Plan participants. An employer "may, and usually does," defray business expenses either by "pass[ing] these costs on to the consumer . . . or [by] lower[ing] his employees' wages proportionately, thus distributing the losses among a wide group." (*Kerr's Catering, supra,* 57 Cal.2d 319, 329; see *Quillian, supra,* 96 Cal.App.3d 156, 162; but cf. *Hudgins, supra,* 34 Cal.App.4th 1109 [prohibiting deductions from the earned commissions of individual employees to reimburse employer for commissions wrongly paid *to others*].)[11]

---

[10] The dissent insists that Ralphs defrayed some of the costs of workers' compensation, and indirectly passed these defrayed costs through to employees, insofar as the Plan formula used the amounts Ralphs had expended for workers' compensation claims to reduce another profit-sapping expense—its payroll. This offsetting effect arose, the dissent says, because as workers' compensation expenses rose, Ralphs's profits, as calculated under the Plan formula, fell by the same amount, and Ralphs's incentive compensation obligations pursuant to the Plan thus also fell to the extent of the profit-sharing multiplier. By this means, the dissent asserts, Ralphs avoided its legal responsibility to bear the full brunt of worker's compensation expenses, and placed a portion of that burden on employees through a reduction of their Plan compensation. What the dissent disregards is that wages under the Plan were calculated, due, and paid only from what Ralphs *had already set aside, after fully absorbing and deducting all expenses, as its own profit.* The fact that workers' compensation costs affected the amount of profit Ralphs had available to share *with* its employees does not mean Ralphs thereby extracted *from* them any deduction or contribution, direct or indirect, to defray worker's compensation costs.

[11] Citing *Quillian* and *Hudgins,* plaintiff urges that Ralphs could not evade the rules against deducting or withholding business losses from wages by using a formula under which the pertinent wage was determined only after the prohibited expenses were factored in. The dissent echoes this argument. But the principle asserted in *Quillian* and *Hudgins* must be considered in the context of the facts there at issue. In those cases, employees were promised commissions set by a specific formula on the basis of *sales volume or revenues* generated by their own individual efforts. Cash and merchandise losses were then assessed against the employees to reduce these expected wages. The order in which calculations were performed to achieve that prohibited result was irrelevant. ICP's such as Ralphs's start from the fundamentally different premise that the *basic* measure of the compensation due is the *overall* profitability of the enterprise. By its inherent nature, such a plan does not promise, or even create, incentive compensation unless and until profitability occurs and is determined. *Quillian* and *Hudgins*

■ Plaintiff cites the policy against subjecting employees to the "special hardship" of "unanticipated or undetermined" wage fluctuations. (*Kerr's Catering, supra*, 57 Cal.2d 319, 329; *Quillian, supra*, 96 Cal.App.3d 156, 163.) Of course, the regular wages paid to Ralphs employees involved no such hardships. Those wages, in concrete dollar amounts, were promised and paid regardless of a store's profit or loss for a specified period. On the other hand, a supplementary incentive compensation plan based on the financial performance of the business is by nature fluctuating and uncertain, insofar as the enterprise's success, and the sums thus available for distribution under the plan, will vary from period to period. But this uncertainty alone cannot cause the plan to violate the wage-protection policies of the Labor Code and Regulation 11070. To hold otherwise would make every kind of achievement-based supplementary incentive compensation system, whether based on individual or overall business performance, illegal.

■ The wage-protection statutes and rules do not demand that employee compensation be absolutely certain or stable from pay period to pay period, regardless of the employees' contrary understanding. Nor do they forbid a system in which, even though services have already been performed, the final amount of wages cannot be determined until after specified contingencies have come to pass.

On the contrary, numerous California cases have held that, where the parties so understand and agree, final compensation, or at least a portion thereof, may be contingent on events that occur after the employee has performed service, and even where he or she has already received advance sums. In such circumstances, the employer may set off, against future payments, any excess amounts previously paid. Such a system does not violate section 221's prohibition on the employer's recapture of wages already earned or paid. (E.g., *Neisendorf v. Levi Strauss & Co.* (2006) 143 Cal.App.4th 509, 520–523 [49 Cal.Rptr.3d 216] [§ 221 not violated by incentive compensation plan which, though based on profits for a particular year, rendered employee who worked that year ineligible for bonus if not still employed on later date when bonuses were distributed]; *Koehl v. Verio, Inc.*

---

cannot be read for the premise that a plan of this kind fails on grounds the relevant "profit" is measured, in accordance with common understanding, by subtracting expenses from revenues.

 Contrary to the dissent's suggestion, nothing we say would require us to uphold, under any of the laws at issue here, a compensation scheme whereby the employer promised the employee compensation of "$15 per hour less $3 per hour for each workers' compensation claim filed by the employee." (Dis. opn., *post*, at p. 250, fn. 5.) What is promised in that case is a $15 per hour wage. *Kerr's Catering, Quillian*, and *Hudgins* indicate that the employer cannot then take a prohibited *deduction from the promised wage*, even if it announces in advance that it will do so. Here, by contrast, no supplemental wage, gross or net, was ever promised except a wage based and calculated, in the first instance, on the store's Plan-defined profit, if any. To recognize this fact is not, as the dissent would have it, simply to manipulate "the point at which to label a payment 'earnings.'" (*Ibid.*)

(2006) 142 Cal.App.4th 1313, 1329–1337 [48 Cal.Rptr.3d 749] [employer may charge back sums advanced on sales commissions, which are not deemed earned until all conditions precedent thereto have been satisfied]; *Steinhebel v. Los Angeles Times Communications, LLC* (2005) 126 Cal.App.4th 696, 704–712 [24 Cal.Rptr.3d 351] [newspaper could charge back commission advances to subscription telemarketers where commission was deemed earned only if subscription was retained for 28 days]; *Prudential Ins. Co. v. Fromberg* (1966) 240 Cal.App.2d 185, 189–193 [49 Cal.Rptr. 475] [system of paying advances on commissions, then charging back excess when final commission was determined did not violate § 221]; see *Hudgins, supra,* 34 Cal.App.4th 1109, 1122 [implying that sales associate could be required, through chargebacks, to return commissions on his or her own sales that were later rescinded by reason of customer returns].)

■ *Kerr's Catering* noted the potential for fraud and deceit in a system whereby unliquidated losses, as unilaterally determined by the employer, are charged to an individual employee through deductions from wages. But this concern, when stretched beyond reasonable limits, proves too much. All forms of employee compensation depend to some degree on the honesty and accuracy of the employer's calculations. Certainly this is true of any fluctuating form of earnings, such as commission-, piece-, or task-based compensation, that relies primarily on the employer's recordkeeping.

However, this concern alone does not mean those forms of incentive pay are forbidden. Similarly, it cannot bar the profit-based ICP at issue here. Indeed, the potential for deceit seems greater where the employer, claiming specific losses or shortages, charges them against an individual employee's pay than where it distributes, among a group of employees, a share of its profits. We are not persuaded that Ralphs's plan is illegal, per se, simply because of the theoretical possibility—concededly not presented here—that Ralphs might cheat in applying it.

Ralphs observes that plaintiff's theories would eliminate *all* profit-based ICP's. Plaintiff and amici curiae Asian Law Caucus, Inc., et al. disagree. They insist Ralphs could, and now does, offer a legal ICP by deleting from the profit formula workers' compensation costs, cash and merchandise losses not attributable to employee fault, and other expenses plaintiff considers to be beyond employee control, such as third party tort claims. However, as Ralphs suggests, it is difficult to see how plaintiff's basic premise would not entirely eliminate net earnings or profits as a legal basis for calculating supplementary incentive compensation.

It is true that plaintiff's complaint and arguments focus on particular categories of employer expenses, such as workers' compensation costs (citing

section 3751) and cash shortages and merchandise losses (citing *Kerr's Catering, Quillian, Hudgins*, and Regulation 11070). But sections 221 through 224, in combination with other statutes, establish a public policy against *any* deductions, setoffs, or recoupments by an employer from employee wages or earnings, except those deductions specifically authorized by statute. (See *Phillips v. Gemini Moving Specialists* (1998) 63 Cal.App.4th 563, 574 [74 Cal.Rptr.2d 29].)

Thus if, as plaintiff insists, expenses used to calculate net earnings or profits for purposes of a supplementary profit-based ICP constitute "deductions" from wages, an employer presumably may not, for this purpose, subtract from its revenues such expenses as the utility bill, rent, cost of merchandise sold, or any other costs the employer actually absorbed before determining its net profit.

In any event, the concept of a supplementary profit-based ICP that may deduct only some actual expenses, but not others, to derive the figure upon which payments are calculated is not persuasive. No legal reason appears why, when an employer chooses or agrees to pay employees, in addition to their regular wages, a portion of its profits, it must artificially *inflate* the earnings figure by omitting expenses that actually reduced those profits.

Nor do plaintiff and his amici curiae demonstrate how such a requirement would serve the public policy of safeguarding employee wages. As plaintiff's counsel conceded at oral argument, Ralphs could compensate for the elimination of certain expenses from the Plan formula simply by lowering the percentage of the resulting "profit" figure that was payable to employees. (See *Kerr's Catering, supra*, 57 Cal.2d 319, 329.)[12] We see nothing in the

---

[12] As a simple example, assume that Ralphs initially subtracts workers' compensation costs, cash shortages, and merchandise losses, in addition to other operating expenses, from store revenues to derive the store profit figure, then shares 10 percent of the resulting profit, or $10 per $100 of profit, with its employees. After being advised that inclusion of workers' compensation costs, cash shortages, and merchandise losses in the profit calculation is illegal, Ralphs eliminates those expenses from the formula, thus artificially inflating the final "profit" figure by 10 percent. To avoid thereby increasing the dollar amount payable to employees under the ICP, Ralphs could then simply reduce the employees' percentage stake in the "profit" from 10 percent to 9.09 percent.

Indeed, if Ralphs *failed* to lower the employees' percentage stake under such circumstances, it would pay a portion of the expenses at issue *twice*. Consider the following example: After paying or absorbing such store expenses as workers' compensation, cash shortages, merchandise damage or loss, and third party tort claims, in a total amount of $10,000, Ralphs registers a store profit of $100,000 for the period, and then, as it has promised to do, shares 10 percent of that profit, or $10,000, with Plan participants. If the expenses described above were omitted from the "profit" calculation for Plan purposes, the "profit" registered would increase from $100,000 to $110,000, and the share payable to Plan participants, if the promised percentage stake remained the same, would thus increase from $10,000 to $11,000. In effect, Ralphs

wage-protection laws, or the policies they promote, that requires such meaningless figure juggling.[13]

Plaintiff, joined by amicus curiae Consumer Attorneys of California, contends at length that, insofar as Ralphs's ICP subtracts a store's workers' compensation costs from its revenues to determine the profit on which supplementary incentive compensation amounts are based, the Plan violates the policy of the workers' compensation law by encouraging store employees not to report valid injury claims for fear of reducing their pay. But one might equally argue that inclusion of workers' compensation costs in the profit calculation *promotes* the goals of the workers' compensation system by encouraging employees to maintain a safe workplace, and by discouraging claim abuse. (*Ralphs Grocery, supra,* 112 Cal.App.4th 1090, 1102.)

In any event, as the *Ralphs Grocery* court recognized, this policy debate is not for the courts to resolve. (*Ralphs Grocery, supra,* 112 Cal.App.4th 1090, 1102.) We conclude only that we find nothing in the statutes, regulation, and cases cited by plaintiff to prohibit Ralphs from offering its employees, over and above their guaranteed base wages, supplementary incentive compensation on the basis of store profits that remain after legitimate store expenses, including the costs of workers' compensation, have been subtracted from store revenues.[14]

---

would have paid or absorbed the $10,000 of expenses as a charge against its actual profit, then paid $1,000 of these expenses again as compensation to Plan participants.

[13] The dissent protests that figure juggling of this sort is not meaningless, because such a formula would at least remove the "perverse incentive[]" for employees to suppress legitimate workers' compensation claims in order to boost the profit figure upon which Plan compensation is calculated. (Dis. opn., *post,* at p. 252.) Whether, and to what extent, an incentive to reduce compensation costs is "perverse" is both debatable and beyond the scope of the issues before us. (See text discussion, *post.*) The point here is that whatever incentives the Plan produced, it did not do so by taking deductions or contributions from employees, their property, or their wages in violation of law.

[14] In an effort to show that Ralphs's incentive compensation formula was not a legitimate profit-sharing plan, Asian Law Caucus, Inc., et al., argue that Ralphs's formula would not qualify, under the Fair Labor Standards Act, as a "bona fide profit-sharing plan," thus excludable from "regular pay" for purposes of calculating an employee's overtime rate. (29 U.S.C. § 207(e)(3).) As amici curiae note, federal regulations defining a "bona fide profit-sharing plan" for this purpose exclude plans, among others, in which employer contributions to a fund for distribution to employees "are based on factors other than profits such as hours of work, production, efficiency, sales or savings in cost." (29 C.F.R. § 549.2 (2006).) As amici curiae further observe, California follows the federal standard for purposes of determining, under the Labor Code, what constitutes an employee's regular pay subject to an overtime rate. (See *Huntington Memorial Hospital v. Superior Court* (2005) 131 Cal.App.4th 893, 902–903 [32 Cal.Rptr.3d 373].) Amici curiae assert that Ralphs's was an unqualified plan under these standards insofar as supplementary incentive compensation payments for a particular store's employees rose when their productivity and efficiency increased that store's revenues and reduced its operating costs, but fell when the opposite result occurred. Even if amici curiae are correct that amounts paid out under Ralphs's plan did not qualify, under overtime rules, for exclusion from employees' regular pay—an issue we need not and do not

Plaintiff argues that, at least with respect to workers' compensation costs, the Legislature has resolved the issue by action subsequent to *Ralphs Grocery*. As plaintiff observes, soon after *Ralphs Grocery* was decided, two bills were introduced in the Senate to add a subdivision (c) to section 3751. The proposed amendment would have specified that use of workers' compensation costs in the calculation of profits for purposes of an employee bonus program does not constitute a deduction from employees' earnings in violation of the section. (Sen. Bill No. 6 (2003–2004 4th Ex. Sess.) as introduced Nov. 19, 2003 (Senate Bill No. 6); Sen. Bill No. 1141 (2003–2004 Reg. Sess.) as introduced Jan. 21, 2004 (Senate Bill No. 1141).)

In each case, plaintiff notes, committee analyses made clear that the purpose was to overturn *Ralphs Grocery* insofar as that decision held otherwise. (See, e.g., Sen. Com. on Lab. & Indus. Relat., analysis of Sen. Bill No. 6, Dec. 1, 2003, pp. 1–2 at <http://info.sen.ca.gov> [as of Aug. 23, 2007]; Sen. Com. on Lab. & Indus. Relat., analysis of Sen. Bill No. 1141, Apr. 26, 2004, pp. 1–2 at <http://info.sen.ca.gov> [as of Aug. 23, 2007].) However, both bills died in committee. (See Sen. Bill No. 6, Complete Bill History at <http://info.sen.ca.gov> [as of Aug. 23, 2007]; Sen. Bill No. 1141, Complete Bill History at <http://info.sen.ca.gov> [as of Aug. 23, 2007].)

Plaintiff urges these developments demonstrate that the Legislature acquiesced in *Ralphs Grocery*'s construction of section 3751, and that it rejected efforts to supersede that decision. We disagree. We have often said that mere legislative inaction is a "weak reed" upon which to rest any conclusion about the Legislature's intent. (E.g., *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873].)

We have sometimes found legislative acquiescence in the construction of a statute where, over a long period of uniform judicial or administrative treatment, the Legislature has addressed the law in question on multiple occasions, yet has not disturbed the settled interpretation. (See, e.g., *People v. Salas* (2006) 37 Cal.4th 967, 979 [38 Cal.Rptr.3d 624, 127 P.3d 40]; *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1014–1015 [32 Cal.Rptr.3d 89, 116 P.3d 550]; *In re Dannenberg* (2005) 34 Cal.4th 1061, 1091 [23 Cal.Rptr.3d 417, 104 P.3d 783]; *Olmstead v. Arthur J. Gallagher & Co.* (2004) 32 Cal.4th 804, 816 [11 Cal.Rptr.3d 298, 86 P.3d 354].) On the other hand, we have declined to base such a conclusion on a bill's mere failure, as here, to clear committee in the legislative chamber where it was introduced. (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 300 [250 Cal.Rptr. 116, 758 P.2d 58].) As we have noted, "failure of the bill to

decide—that issue simply has nothing to do with whether Ralphs *was precluded from offering* such a plan under California law.

reach the [chamber] floor is [not] determinative of the intent of the [chamber] as a whole that the proposed legislation should fail." (*Ibid.*)

At the time Senate Bills Nos. 6 and 1141 were introduced, only a single recent Court of Appeal case had considered how section 3751 should apply to profit-sharing incentive compensation plans. We decline to infer, solely from the fact these bills died without a floor vote in the Senate, that the Legislature as a whole accepted the holding of this decision. Many reasons could explain the Legislature's failure to consider the bills further, including the press of other business, political considerations, or a tendency, at least in the short run, to trust the courts to correct their own errors. (*County of Los Angeles v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391, 403–404 [179 Cal.Rptr. 214, 637 P.2d 681].) The Legislature's mere inaction on two hastily presented bills cannot foreclose this court from examining, in the normal course, the *Ralphs Grocery* decision and the issues it addressed. Plaintiff's claim of legislative acquiescence must be rejected.

 Therefore, we hold that Ralphs's profit-based supplementary ICP, designed to reward employees beyond their normal pay for their collective contribution to store profits, did not violate the wage protection policies of Labor Code sections 221, 400 through 410, or 3751, or Regulation 11070, insofar as the Plan included store expenses such as workers' compensation costs, cash and merchandise shortages, breakage, and third party tort claims in the profit calculation.[15] The derivative claim of liability under Business and Professions Code section 17200 thus also fails. Accordingly, we will reverse the decision of the Court of Appeal, which reversed the judgment of dismissal entered after the trial court sustained Ralphs's demurrer to plaintiff's complaint without leave to amend. We will also disapprove *Ralphs Grocery, supra,* 112 Cal.App.4th 1090, to the extent it reaches contrary conclusions.

---

[15] We have found no decisions from other jurisdictions directly on point. However, the most closely applicable non-California case tends to support our conclusion here. New York, similarly to California, defines "wages" to include all "earnings of an employee for labor or services rendered," including earnings calculated "on a time, piece, commission or other basis." (N.Y. Lab. Law, § 190(1).) The statutes and related regulations protect such "wages" from all "deductions," other than those specifically authorized by law, and they specifically prohibit deductions for, among other things, "spoilage," "breakage," and "cash shortages or losses." (E.g., N.Y. Lab. Law, § 193; N.Y. Comp. Codes R. & Regs., tit. 12, §§ 137-2.5(a), 138-3.6(a), 141-2.10(a), 142-2.10(a), 142-3.11(a), 190-5.1(a).) In *Truelove v. Northeast Capital* (2000) 95 N.Y.2d 220 [715 N.Y.S.2d 366, 738 N.E.2d 770], the New York Court of Appeals held that a bonus offered, in addition to the employee's regular remuneration, as a "[d]iscretionary . . . share in a reward to all employees for the success of the employer's entrepreneurship," is not sufficiently linked to the employee's personal rendition of services to constitute "wages" within the protection of these statutes and regulations. (*Id.* at p. 772.) Ralphs, of course, does not argue here that amounts distributed to employees under the Plan are not "wages."

## DISPOSITION

The judgment of the Court of Appeal is reversed. *Ralphs Grocery Co. v. Superior Court, supra*, 112 Cal.App.4th 1090, is disapproved to the extent it reaches conclusions contrary to the views expressed in this opinion.

George, C. J., Chin, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Dissenting.—This is a case of statutory interpretation. Labor Code section 3751[1] prohibits employers from directly *or indirectly* passing all or *any part* of their workers' compensation costs back to their employees through deductions from their employees' compensation. Ralphs Grocery Company, Inc.'s compensation plan does just that. Whatever this court's views concerning the reasonableness and desirability of such plans, judicial notions of policy are irrelevant if the Legislature's policy decision, as embodied in the text of the statute, compels a different result. It does so here. Accordingly, I respectfully dissent.

### I

As this case is before us on demurrer, we must accept as true all well-pleaded allegations in plaintiff Eddy Korkiat Prachasaisoradej's second amended complaint (complaint).

Prachasaisoradej is a Ralphs Grocery Company, Inc. (Ralphs), employee. He sued Ralphs under the unfair competition law for adopting an employee compensation plan that, according to the complaint, made compensation partially contingent on, inter alia, (1) Ralphs's workers' compensation costs, and (2) cash and merchandise shortages. Prachasaisoradej contended the compensation plan violates section 3751 (barring employer pass-throughs of workers' compensation costs), as well as various other Labor Code provisions and a Labor Commissioner wage order governing employer pass-throughs of cash and merchandise shortages.

The particulars of the plan are not in dispute. Ralphs computes its employee compensation based in part on a fixed wage and in part on a bonus tied to store performance compared with projections. Each store has a financial target, and the employee bonuses for each store are based on how that store does compared to its target. Under Ralphs's formula for measuring

---

[1] All further unspecified statutory references are to the Labor Code.

store performance, when an employee files a workers' compensation claim, the expenses for that claim are charged against the store where the claimant works. Consequently, an employee's filing of a workers' compensation claim reduces the store's performance figure and the resulting bonuses employees at that store receive. The same is true of cash shortages and merchandise losses, which are likewise charged against a store's performance figure and reduce its employees' compensation. The only question is whether this arrangement is lawful.

## II

For purposes of Prachasaisoradej's workers' compensation deduction claim, one statute is central. Section 3751, subdivision (a) provides in part: "No employer shall exact or receive from any employee *any* contribution, or make or take *any* deduction from the earnings of any employee, *either directly or indirectly*, to cover the whole *or any part* of the cost of [workers'] compensation . . . ." (Italics added.)

Ralphs does not contest that its bonus plan constitutes "earnings" within the meaning of section 3751. Thus, the only question under section 3751 is whether Ralphs's plan involves a "direct[] or indirect[]" deduction from its employees' earnings "to cover the whole *or any part* of the cost of [workers'] compensation." (Italics added.) As section 3751 regulates employee wages and working conditions, it must be broadly construed in favor of ensuring the workers' protections it was intended to guarantee: "[I]n light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection. . . . 'They are not construed within narrow limits of the letter of the law, but rather are to be given liberal effect to promote the general object sought to be accomplished . . . .' "[2] (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579]; see also *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103–1104 [56 Cal.Rptr.3d 880, 155 P.3d 284]; *Henning v. Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1269 [252 Cal.Rptr. 278, 762 P.2d 442]; *Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319, 330 [19 Cal.Rptr. 492, 369 P.2d 20] (*Kerr's Catering*) [the "Legislature and our courts have accorded to wages special considerations" in order to protect the "welfare of the wage earner"]; § 3202 [workers' compensation scheme, of which § 3751 is a part, should be interpreted liberally in favor of workers].)

---

[2] While the majority acknowledges this principle, it does not apply it, and after citing the language of section 3751 once, never again attempts to discern the full statutory text's meaning or address its implications.

Rudimentary math and economics demonstrate that Ralphs's plan exacts, at the least, an indirect deduction from employee compensation for part of Ralphs's workers' compensation costs. Bonuses are calculated on the basis of Ralphs's special formula for plan-defined "profit." That formula includes workers' compensation costs as a deduction. Thus, if workers' compensation costs go up, the performance figure used in the calculation goes down, as does the bonus paid out. Consequently, each employee's bonus figure is tied to the employer's workers' compensation costs at the employee's store; as those costs rise, the employee suffers a corresponding reduction in compensation.

Granted, the deduction is not dollar for dollar, but the linkage of employee compensation to the employer's workers' compensation costs is direct and inescapable. Moreover, section 3751's prohibition is not limited only to dollar-for-dollar deductions. It applies even to "indirect[]" deductions to cover "any part" of the cost of workers' compensation. (*Ibid.*) Through its bonus plan, Ralphs allays a portion of its workers' compensation costs. If those costs rise $1, its bonus plan reduces employee compensation by some corresponding amount. Whether it thereby saves 5 cents or 50 cents on the dollar is immaterial, as the statute makes no distinction; either is illegal. Ralphs does not have to structure as a bonus plan any part of the compensation package it offers employees, but if it does, it may not make compensation contingent on workers' compensation costs.

Ralphs's plan directly implicates the rationale behind the statute. The premise of the workers' compensation scheme, of which section 3751 is a part, is that in exchange for relinquishing tort-based remedies for industrial injury, workers receive the assurance of no-fault compensation from their employers; conversely, employers, in exchange for a shield from tort liability, must bear the cost of injuries suffered by workers in their employ. (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 16 [276 Cal.Rptr. 303, 801 P.2d 1054].) By including workers' compensation costs in its formula to measure store performance, Ralphs ensures that any rise in workers' compensation costs will be partially allayed by reduced payroll costs, as a portion of the industrial accident burden is shifted to Ralphs's employees. The Legislature made a decision nearly 100 years ago to require employers alone to bear the financial costs of industrial safety. We should enforce that decision.

The complaint identifies a second way in which Ralphs's plan undermines the Legislature's workers' compensation scheme. The structure of Ralphs's plan, under which the costs of each workers' compensation claim are charged to that store's performance figure, creates a disincentive for injured employees to file even valid claims, as well as an incentive for fellow employees to pressure injured workers not to file claims. We may reasonably construe section 3751 as intended to protect against just such consequences. While the

majority argues instead that "inclusion of workers' compensation costs in the profit calculation [might] *promote*[] the goals of the workers' compensation system by encouraging employees to maintain a safe workplace, and by discouraging claim abuse" (maj. opn., *ante*, at p. 242),[3] this is beside the point; as the majority acknowledges, "this policy debate is not for the courts to resolve" (*ibid.*)—because the Legislature has already done so.

The lone case to analyze section 3751 in this context, *Ralphs Grocery Co. v. Superior Court* (2003) 112 Cal.App.4th 1090 [5 Cal.Rptr.3d 687] (*Ralphs Grocery*), arrived at the same conclusion: Ralphs's plan runs afoul of "the plain language and clear meaning" of section 3751. (*Ralphs Grocery*, at p. 1102.) "Ralphs's bonus plainly constitutes employee 'earnings' within the meaning of the statute; and the alleged deduction for workers' compensation costs in the bonus calculation is, at the very least, an indirect means of holding employees responsible for such costs." (*Ibid.*, fn. omitted.)

Section 3751 prohibits the passthrough of workers' compensation costs in the broadest possible terms. We are obligated to liberally construe that statute. Where, as here, a compensation plan both falls afoul of the literal terms of the statute and directly undermines the legislative goals underlying its adoption, it violates the statute. Accordingly, Prachasaisoradej has stated a claim.[4]

## III

In reaching its contrary result, the majority appeals to "reason and common sense" (maj. opn., *ante*, at p. 237): Why cannot an employer base an employee bonus plan on its net profits? The answer is because in the limited sense of "profits" involved in this case, the Legislature has determined it cannot. The majority avoids this conclusion by focusing on form over

---

[3] Perhaps it might. So might simply requiring employees to pay their own workers' compensation awards.

[4] Arguably, similar principles extend to Ralphs's deduction of cash and merchandise shortages in the bonus calculation formula. (See Cal. Code Regs., tit. 8, § 11070 [prohibiting deductions for shortages absent employee malfeasance]; *Kerr's Catering*, *supra*, 57 Cal.2d at pp. 322–323 [sustaining regulation making it unlawful to subtract shortages from wages]; *Ralphs Grocery*, *supra*, 112 Cal.App.4th at pp. 1104–1105 [holding unlawful calculation of bonus according to formula that included deduction for shortages]; *Quillian v. Lion Oil Company* (1979) 96 Cal.App.3d 156 [157 Cal.Rptr. 740] (*Quillian*) [same].) Notwithstanding anything in the majority's opinion that might suggest employers are free to take deductions from employees' earnings *absent* an explicit prohibition (see maj. opn., *ante*, at p. 236), the Labor Code plainly prohibits employers from taking deductions from employees' wages *unless specifically authorized.* (§§ 221, 224.) However, analysis of Prachasaisoradej's section 3751 claim is sufficient to demonstrate that, as the Court of Appeal correctly concluded, Prachasaisoradej's complaint should have survived demurrer. Accordingly, I do not dwell on his remaining claims.

function; purporting to define the moment at which the formal label "wages" or "earnings" attaches, the majority then asks whether workers' compensation and other costs are subtracted *before* or *after* that largely arbitrary point, rather than focusing, as the rule of liberality requires, on whether the actual economic effect of the plan is of a type the Legislature condemned.

Relying on a series of dictionary definitions, the majority asserts it is only the final figure that results from Ralphs's bonus calculation that Ralphs "offered or promised as compensation for labor performed by eligible employees, and *it thus represented their supplemental 'wages' or 'earnings.' "* (Maj. opn., *ante*, at p. 229.) Accordingly, only this end figure is immune from workers' compensation or other deductions; any calculations that precede it simply are not subject to the restrictions of section 3751 or any similar provision.

California courts have seen this sort of legerdemain before and properly rejected it. In *Quillian, supra*, 96 Cal.App.3d 156, as here, the employer offered its employee a base wage and a bonus. The bonus was calculated based on gas sales, other sales, and cash or inventory shortages. The employer repeatedly emphasized in the parties' agreement that only the final result of this calculation was a bonus due the employee, and thus no shortages were deducted from the employee's bonus. It argued to the court that its bonus plan was a valid way of creating employee incentives to increase sales and decrease shortages.

The *Quillian* court saw through this scheme. It recognized that simply labeling the final result of the calculation as the bonus due the employee did not immunize the calculation itself from scrutiny; the calculation itself involved a direct subtraction of shortages from the payment to the employee; and notwithstanding semantics, "the result is the same. The [employee] carries the burden of losses from the [business]." (*Quillian, supra*, 96 Cal.App.3d at p. 163.) The employer was prohibited by law from using this means to create an incentive for its workers to reduce shortages.

So too here. Ralphs attached the label of bonus only to the end product of its calculation. The majority accepts that characterization. In so doing, it ignores that the result here is the same as in *Quillian*; the calculation leading up to the moment when the "bonus" label attaches illegally places on the employees the burden of workers' compensation costs. (See *Hudgins v. Neiman Marcus Group, Inc.* (1995) 34 Cal.App.4th 1109, 1124 [41 Cal.Rptr.2d 46] (*Hudgins*) [employer "cannot avoid a finding that its . . .

policy is unlawful simply by asserting that the deduction is just a step in its calculation of commission income"].) Here, as in *Quillian*, this method of computing compensation contravenes the clear statutory rule the Legislature has adopted against such burden-shifting.[5]

That the compensation plan may not upset employee expectations concerning payment, as the majority argues, is not determinative; employee expectations are but one of the interests protected by the relevant statutes. Speculation that employee expectations are not disturbed will not insulate from invalidation a plan that otherwise violates section 3751. In a similar vein, the majority frames this case as one involving "supplementary compensation," with the implication that these payments are made at the grace of the employer and hencecan be calculated any way the employer wishes so long as any deduction does not drive compensation below the minimum wage. (Maj. opn., *ante*, at pp. 223, 228 & fn. 5.) But that the compensation is by way of a bonus plan is irrelevant; an employer cannot, through the device of separating compensation into multiple parts, insulate its payments from the operative statutes governing unlawful deductions. (See *Kerr's Catering*, *supra*, 57 Cal.2d at p. 322 [invalidating unlawful deductions taken from payments made on top of regular wages]; *Ralphs Grocery*, *supra*, 112 Cal.App.4th at p. 1104 [same]; *Quillian*, *supra*, 96 Cal.App.3d at pp. 158–159 [same].)

The majority seeks to distinguish the various cases that have long recognized broad limits on employers' ability to take certain types of deductions from employee compensation and thereby pass the costs of doing business directly back to employees. (E.g., *Kerr's Catering*, *supra*, 57 Cal.2d 319; *Ralphs Grocery*, *supra*, 112 Cal.App.4th 1090; *Quillian*, *supra*, 96 Cal.App.3d 156; *Hudgins*, *supra*, 34 Cal.App.4th 1109.) The majority offers essentially three reasons why the compensation system at issue here differs from those previously found unlawful. First, it involves no deduction from an amount already promised or offered; the amount promised or offered is only the bonus, if any, that results from Ralphs's calculation. This distinction is no

---

[5] The consequence of the majority's formalistic approach is striking. Suppose an employer "offer[s] or promise[s] as compensation" to its employees $15 per hour less $3 per hour for each workers' compensation claim filed by the employee. The deduction is made before any amount is offered or promised to the employee; only the final offered amount constitutes wages; and this method of calculating wages is thus entirely consonant with the majority's application of section 3751. It is not, however, consonant with the Legislature's intent to leave workers' compensation costs with employers, not their employees.

The majority asserts that in this $15 minus $3 hypothetical, the $15 is actually the promised amount from which no deductions may be taken. (Maj. opn., *ante*, at p. 238, fn. 11.) In doing so, it only reinforces that its selection of the point at which to label a payment "earnings" is arbitrary and a matter of convenience, not based on any clear legal principle capable of predictable application.

distinction, but rests on the arbitrary selection of the final calculation of the bonus as the point at which legal protection against deductions attaches. As noted above, in *Quillian* as here only the final bonus amount was promised or offered; the court nevertheless recognized that legal protections against unlawful deductions applied equally to the formula used in calculating the offered bonus.

Second, the majority notes that unlike previous cases this plan does not involve a dollar-for-dollar deduction, but only a partial deduction. This is a distinction, but one without a difference. Section 3751 by its terms expressly prohibits deductions "to cover the whole or any part" of workers' compensation costs. What an employer may not do in whole, it may not do in part. (See *Ralphs Grocery, supra,* 112 Cal.App.4th at p. 1104.)

Third, the majority contends that unlike in past cases there is no genuine pass-through of costs; the employer absorbs all costs itself. Although superficially appealing, this assertion betrays a lack of understanding of the economic effects of the compensation plan's structure. That Ralphs initially bears the costs of workers' compensation is true. In this sense, this case is no different from *Kerr's Catering, supra,* 57 Cal.2d 319, *Quillian, supra,* 96 Cal.App.3d 156, and *Hudgins, supra,* 34 Cal.App.4th 1109, in which the employer likewise initially bore various costs. But by including workers' compensation as a deduction in the subsequent calculation of employee bonuses, Ralphs recaptures a portion of these costs. If they rise, its payroll falls. For each additional dollar it spends on workers' compensation, the performance figure for the store where a workers' compensation claim was made drops by $1, and the bonuses and payroll it must pay at that store likewise drop, thereby defraying these expenses through reduced employee compensation. As in *Kerr's Catering, Quillian,* and *Hudgins,* Ralphs covers expenses the Legislature has determined it should bear by reducing its calculation of employee compensation. As in *Kerr's Catering, Quillian,* and *Hudgins,* that practice is illegal.[6]

The majority salts its opinion with the language of "profits," repeatedly referring to the compensation scheme as a profit-based plan. This offers two rhetorical advantages. First, it affords the plan a presumption of validity, as who could rightly object to a company sharing its profits with its workers? More to the point, who could complain if in the absence of profits no bonuses are paid? Second, it allows the majority to dismiss any asserted statutorily

---

[6] Moreover, even if these cases were distinguishable in any material respect, none interpreted section 3751, and none offers any basis for reading the broad language of section 3751 more narrowly than its plain language warrants.

compelled modifications to Ralphs's formula as involving the "artificial inflat[ion]" of profits. (See maj. opn., *ante*, at pp. 241–242.) At its core, the majority's position rests on the belief that a calculation of bonus compensation that includes a workers' compensation deduction is more just and authentic, and any calculation that removes that factor is unjust and a distortion of reality.

In truth, no bonus compensation formula has any inherent claim of virtue or correctness. In calculating compensation, Ralphs may mix in earnings and costs however it chooses, adding in those items it desires its employees to increase (e.g., sales) and subtracting out or assessing charges for those items it desires its employees to decrease.[7] What Ralphs cannot do in constructing its formula is include factors the Legislature has decided should play no role in the calculation of employment compensation. Workers' compensation is such a factor. Nor would complying with the law require Ralphs to artificially inflate its profits. The figure Ralphs uses to calculate employee bonuses is not necessarily a true profit figure; rather, it is a "plan-defined profit." But even if it were, in this context, nothing would be wrong with "artificial inflation," per se. The figures Ralphs, or any employer, uses in computing incentive-based compensation are used *for that purpose only*; they need not inflate their earnings in public statements issued to investors or filed with the Securities and Exchange Commission.

As amicus curiae Asian Law Caucus, Inc., correctly notes, employers can still adopt incentive plans tied to a company's sales and revenue. They simply cannot also tie the plan to workers' compensation costs. If enforcement of section 3751 according to its terms results in a higher base "earnings" figure, thereby potentially increasing employee compensation, employers may adjust by offering or negotiating a lower percentage multiplier, e.g., 10 percent of a modified figure rather than 15 percent of the current figure. This modification is not "meaningless figure juggling" (maj. opn., *ante*, at pp. 242–242), as the majority complains; under one compensation scheme employees are burdened with a disincentive to file workers' compensation claims and have an incentive to pressure their peers not to submit valid claims; under the other, these perverse incentives disappear.

---

[7] *From the complaint, it appears Ralphs is choosing its formula arbitrarily, building it from the ground up. To the extent its store performance figure may be loosely based on EBITDA (earnings before interest, taxes, depreciation, and amortization), EBITDA is a non-GAAP (generally accepted accounting principles) economic measure and may be calculated almost any way Ralphs pleases.*

## IV

I do not disagree with the majority that an employer may offer incentives to employees based on their efforts to increase revenue and to reduce *some* costs. The Legislature has made a judgment that workers' compensation costs may not be wholly or partially recaptured from employees by docking their compensation in response to cost increases. Such a financial arrangement turns the workers' compensation scheme on its head, forcing employees to subsidize their own insurance against industrial injury, a burden this state has chosen to place exclusively on employers. We are not at liberty to disturb the Legislature's judgment in this regard. I respectfully dissent.

Kennard, J., and Moreno, J., concurred.